THE STATE v. CRAIG, Appellant.

Division Two, July 3, 1905.

1. **INSTRUCTIONS: For First Degree Murder: Conviction of Lower Degree.** Although a defendant may be indicted for murder in the first degree, if he is convicted of a lower degree of homicide, he cannot complain of the giving of an instruction on murder in the first degree, since the conviction on the lower degree is virtually an acquittal on the higher.

2. **DYING DECLARATION: When Admissible.** In order to justify the admission in evidence of a dying declaration, it must appear that it was made under a sense of impending and immediate death, and that the declarant at the time he made the declaration believed that he had no hope of recovery.

3. ———: ———: **This Case.** The evidence showed that the physician informed deceased that he was a very sick man, that the chances were all against his getting well, and that he could not possibly get well; that deceased said, "I can't afford to die," but said also, "Well, I will be ready for the big show;" that his lips were then blue, his breast rising and falling fast, and that he was gasping for breath; that he then made a dying statement in which he declared he believed he was about to die; that, "I am told by the doctors I am about to die, and make this as my dying statement;" and that he died in less than three hours thereafter. *Held*, that the dying declaration was properly admitted in evidence.

4. **MANSLAUGHTER: Sufficiency of Evidence.** The evidence in this case, set out in the opinion, is held sufficient to justify the verdict finding defendant guilty of manslaughter in the fourth degree.

Appeal from Buchanan Criminal Court.—*Hon. Benj. J. Casteel*, Judge.

AFFIRMED.

State v. Craig.

*F. F. Harl, K. G. Porter* and *C. F. Strop* for appellant.

(1) There being no evidence of murder in the first degree, the giving of instruction upon that offense was tantamount to the court's telling the jury that there was some evidence of murder in the first degree which necessarily would have the effect of prejudicing the defendant's rights. Bishop, Criminal Procedure (3 Ed.), 980; Parker v. State (Tex.), 3 S. W. 100. (2) The admission of the alleged dying declaration was fatal error. In order to justify the admission of dying declarations, the impression of impending and immediate death and the absence of any hope to recover was essential. State v. Wensell, 98 Mo. 142; State v. Simon, 50 Mo. 373; State v. Partlow, 90 Mo. 629. (3) The whole evidence shows a perfect case of self-defense and shows that the verdict of the jury is not justified by the evidence.

*Herbert S. Hadley*, Attorney-General, and *John Kennish*, Assistant Attorney-General, for the State.

(1) Defendant was convicted of manslaughter in the fourth degree, and, therefore, cannot be heard to complain of an instruction on murder in the first degree. This is now the well-settled law in this State. State v. Fritterer, 65 Mo. 422; State v. Wilson, 98 Mo. 440; State v. Snell, 78 Mo. 243; State v. Sansone, 116 Mo. 1. (2) The court did not err in admitting in evidence the dying declaration of Lincolnhoeger. State v. Wensell, 98 Mo. 135; State v. Garth, 164 Mo. 553; State v. Nocton, 121 Mo. 537; State v. Vaughan, 152 Mo. 73. (3) The evidence is sufficient to support the verdict. It is not the province of the appellate court to weigh the evidence. State v. DeWitt, 152 Mo. 76; State v. Williams, 149 Mo. 496.

BURGESS, P. J.—Defendant was tried and convicted at the June term, 1903, of the criminal court of Buchanan county, of manslaughter in the fourth degree, and his punishment fixed at two years imprisonment in the penitentiary, upon an information filed by the prosecuting attorney of said county, charging him with murder in the first degree, for having, on the third day of November, 1902, at said county, stabbed and mortally wounded with a knife one Walter J. Lincolnhœger, from the effects of which stabbing and wounding, on the 16th day of November, 1902, the said Lincolnhœger died.

The defendant, Robert S. Craig, at the time of the homicide, was a blacksmith in the city of St. Joseph, Missouri, and had in his employ as such the deceased, Lincolnhœger, and one Philip O. Lucas. Craig and deceased had a difficulty over the location and arrangement of a forge. It seems from the evidence that Lincolnhœger had placed in position the bellows which was to be used in the operation of the forge, but which did not work well, and Craig was dissatisfied over it. He made some remark to the effect that the bellows did not work to suit him, when Lincolnhœger retorted: "I guess everybody is damned fools that hangs bellows that way." Craig then walked over to where Lincolnhœger was standing and said, "Don't talk back to me in my shop." Deceased replied: "Come outside, and I will whip you in a minute." Craig then said, "I won't go out to fight you." After saying this he, Craig, went into a closet connected with the shop, came out in a few seconds with a big knife in his hand, went around the closet to where deceased was, and said to him: "You big son-of-a-bitch, shut up now, or I will make you shut up." He then struck at deceased with the knife, and at about the same time deceased struck at him with his fist. Craig cut and stabbed deceased four or five times, when deceased struck him a blow with his fist and knocked him down. Deceased then

ran out of the shop and came near running into a carriage team that was being driven along the street. The driver saw him running out and a man following him, and, checking his team he, the driver, heard deceased say, "Mr. Craig, please call me a doctor." To this defendant replied, prefixing the remark with a vulgar epithet, "You ought to bleed to death." The next day, in talking about the difficulty, defendant was shown to have said in the hearing of two persons, in answer to a question as to how the difficulty happened, "Oh, you know my beastly temper; my temper got the best of me."

When deceased ran out in the street Lucas went out to him, and he requested Lucas to get him a doctor, at the same time stating that he was bleeding to death. Lucas took him to a doctor, and his wounds were examined and given surgical attention. The examination disclosed a gash on his left arm just above the elbow, a stab wound on the left side below the arm, and further down another stab between the ribs; a stab wound on the right side between the fourth and fifth ribs, and one or two scratches that did not require attention. It was found that the stab wound on the right side had penetrated through the chest wall and punctured the lung tissue to a depth of about three-quarters of an inch.

The deceased, after his wounds were dressed, was removed to a hospital. His condition seemed to improve at the hospital, until the 16th day of November, 1902, when about seven o'clock in the morning of said day he began to change for the worse. The attending physician arrived about nine o'clock, discovered the change in the patient's condition, and sent for the prosecuting attorney and his assistant. After they arrived the doctor advised the deceased of the change in his condition. The deceased answered that he did not feel any worse. The doctor testified: "I said, 'Walter, you are a very sick man, and the chances are all against your getting well, you are sinking now.' He looked at

me and said, 'Doctor, am I going to die?' I said, 'Walter, I don't believe you can possibly get well.' He said, 'I can't afford to die.' ''

The prosecuting attorney then interrogated him, and he made a written statement of the facts concerning his condition, saying he believed he was about to die, and also as to the facts concerning the difficulty between him and the defendant, which statement the prosecuting attorney reduced to writing, read the same over to him, and he signed it. The declaration was signed about eleven o'clock, a. m., and deceased died about 1:20 p. m. the same day. The paper read as the dying declaration of deceased was as follows:

"Walter Lincolnhœger, believing I am about to die, make this statement at 10:55 a. m., this 16th day of November, 1902. On Nov. 3rd, 1902, Bob Craig cut me with a knife. He called me a big son-of-a-bitch. I called him no name. We had an argument first and then we decided to let the argument drop. He went to the closet and then he came out with the knife. I went into a corner to wash and soon he came out, called me the name and he reached up his hand and I saw it was fight. When he pulled his glasses off I knew it meant fight. I don't know who struck first, I think we struck about the same time. He cut me with the knife. I never at any time had any weapons in my hand. I was cut four or five times. I tried to defend myself as best I could. I am twenty-six years old this month. After our first argument and when we agreed to drop the matter I supposed everything was settled—went to the corner to wash myself and he went to the closet. He soon came out and took his glasses off, called me a son-of-a-bitch and had his big knife. I was taken entirely by surprise and defended myself as best I could. I am told by the doctors I am about to die and make this as my dying statement.

"Signed. W. J. LINCOLNHOEGER."

The defendant, as witness in his own behalf, testified, in substance, that immediately before the difficulty Lincolnhœger was angry because the bellows put up by him was not satisfactory to the defendant, and began quarreling with the defendant, applying vile epithets to him and daring him to go outside the shop to fight; that defendant tried to quiet Lincolnhœger by telling him that he did not want to have any trouble; that as defendant went back in the shop to get his coat to go home, Lincolnhœger, using a vile epithet, struck defendant, and then seizing defendant by the throat pushed him back in the corner over the sink, and that Lincolnhœger while so holding defendant by the throat and striking him with his fist, reached for a rasp which was in a box within his reach, and that then he, the defendant, got his knife out of his pocket and began cutting Lincolnhœger, who finally knocked him down, and that that ended the fight. The defendant denied making the statement as testified to by the carriage driver, and also denied that he said the day after, in the presence of two other persons, in answer to a question as to how the fight happened, that "my beastly temper got the best of me."

The first point presented for our consideration upon this appeal is the insistence of the defendant that, as there was no evidence of murder in the first degree, the giving of instructions upon that offense was tantamount to the court's telling the jury that there was some evidence of murder in the first degree, which necessarily would have the effect of prejudicing the defendant's rights. The argument is that it is well known that all verdicts are the result of compromises, and it is insisted that the submission of instructions on murder in the first degree, although the defendant was found guilty of a lesser offense, necessarily and logically assisted in causing the verdict of guilty of some offense.

Whatever the rule may be in other jurisdictions, it is well settled in this State that, although a person be indicted for murder in the first degree and convicted of a lesser degree of homicide, he cannot be heard to complain of an instruction on murder in the first degree because not found guilty of that offense.

In State v. Fritterer, 65 Mo. 422, the defendant was indicted for murder in the first degree and was convicted of murder in the second degree, and it was ruled that the effect of the verdict was to acquit the defendant of murder in the first degree—that he had not, in any view that could be taken of the case, been injured or prejudiced by any supposed error in the instructions for murder in the first degree.

In State v. Sansone, 116 Mo. l. c. 12, it is said: "The first objection made by defendant to the instructions is, that the court erred in giving an instruction for murder in the first degree, but as he was virtually acquitted of that offense by the verdict of guilty in the second degree, the supposed error cannot injure or prejudice him, and it certainly constitutes no ground for reversal." [State v. Dunn, 80 Mo. 693.]

The principal question in this case, and one upon which the defendant chiefly relies for reversal of the judgment, is the act of the court in admitting in evidence a paper writing as the dying declaration of the deceased, which defendant contends was error. It has always been ruled in this State that, in order to justify the admission of dying declarations, the impression of impending and immediate death and absence of any hope of recovery is essential to the admission of such declaration. The evidence in this case discloses that the deceased had been fatally stabbed; that he seemed to improve in the first instance, from the time the stabbing occurred until the morning of the 16th day of November; that about seven or eight o'clock in the morning of said day, there began a change for the worse in his condition, and that his physician arrived

about nine o'clock, noticed the change in the condition
of the deceased, and advised him of that fact. He an-
swered the doctor, saying, he did not feel any worse.
The doctor said, "Walter, you are a very sick man,
and the chances are all against your getting well; you
are sinking now." Testifying further, the doctor said,
"He looked at me and said, 'Doctor, am I going to die?'
I said, 'Walter, I don't believe you can possibly get
well.' He said, 'I can't afford to die.'" Witness Mot-
ter testified that he, the deceased, said at the same time,
"Well, I will be ready for the big show." Said witness
also testified that the lips of the deceased were then
blue; that his breast was rising and falling, that he
was gasping for breath, and that he died within two
hours thereafter. Deceased declared in the statement
itself, which the evidence shows was written down as
he made it in answer to questions asked, that he be-
lieved he was about to die; that the doctor told him he
was about to die, and that he made that as his dying
statement. This was read over to him, and he signed it.
It is true that, when the doctor told him he could not
get well, he said he could not afford to die, which would
seem to indicate that he had not then abandoned all
hope of recovery; but that he came to a different con-
clusion and believed that his end was near at hand is
clearly indicated by the statement itself, in which he
says, "believing I am about to die, make this statement
at 10:55 a. m., this 16th day of November, 1902." He
died about 1:20 p. m., the same day. While deceased
said nothing as to when he expected to die, the question
was not asked him, nor was it necessary for the admis-
sion of the declaration in evidence that he should have
made a formal statement that he was without hope of
recovery; but "it is not enough that the declarant
should have thought that he should ultimately never re-
cover; the declaration should be made under an impres-
sion of almost immediate dissolution." [State v. John-
son, 118 Mo. l. c. 501, and authorities cited; State v.

Nocton, 121 Mo. 537.] In so far as the evidence preliminary to the introduction of the dying declaration of the deceased in that case was concerned, it was much the same as in the case at bar, and it was held admissible. In that case there is quoted with approval from 1 Greenleaf on Evidence (14 Ed.), sec. 158, the following:

"It is essential to the admissibility of these declarations, and is a preliminary fact to be proved by the party offering them in evidence, that they were made under a sense of impending death; but it is not necessary that they should be stated, at the time, to be so made. It is enough, if it satisfactorily appears, in any mode, that they were made under that sanction; whether it be directly proved by the express language of the declarant, or be inferred from his evident danger, or the opinion of the medical or other attendants, stated to him, or from his conduct, or other circumstances of the case, all of which are resorted to, in order to ascertain the state of the declarant's mind. The length of the time which elapsed between the declaration and the death of the declarant furnishes no rule for the admission or rejection of the evidence; though, in the absence of better testimony, it may serve as one of the exponents of the deceased's belief that his dissolution was, or was not, impending. It is the impression of almost immediate dissolution, and not the rapid succession of death, in point of fact, that renders the testimony admissible." [3 Russell on Crimes (9 Am. Ed.), 250; 6 Am. and Ency. Law, p. 108, et seq., and cases cited.] In the recent case of State v. Brown, 188 Mo. l. c. 460, the same subject was again under consideration, and the Nocton case was followed with approval.

While deceased's remark that he did not feel any worse, in reply to his attending physician's statement that the chances for his recovery were all against him and that he was then sinking, would seem to indicate that he was somewhat surprised, and this together with

his further remark that he could not afford to die, after being told by the physician that could not possibly get well, tend to show that he was not then apprehensive of immediate dissolution, it is also shown by the evidence that when informed that he could not get well, he said, "I will be ready for the big show," and that his lips were then blue, his breast rising and falling, and that he was gasping for breath; that he then made the statement itself, which the evidence shows was written down as he made it in answer to questions asked, and read over to and signed by him, in which statement he said he believed he was about to die; that the doctors told him he was about to die, and that he made it as his dying statement; that he died within less than three hours thereafter—all of which tends strongly to show that at the time of making the declaration his feelings and opinions respecting his recovery had undergone a change, in consequence, in all probability, of the statement of his physician, in whom he had confidence, that he could not possibly get well and was then sinking, and that the declaration was made under a sense of impending dissolution.

There was no error committed in admitting the declaration in evidence.

With respect to the contention that the evidence shows a case of perfect self-defense, and that the verdict of the jury was not justified by the evidence, it is only necessary to say, in regard to the first proposition, that it was for the consideration of the jury, under the evidence and the instructions of the court, and that the verdict of the jury was well warranted by the evidence.

Finding no reversible error in the record, we affirm the judgment.

All concur.