STATE, RESPONDENT, *v.* BYRD, APPELLANT.

(No. 2,864.)

(Submitted September 15, 1910.    Decided October 13, 1910.)

[111 Pac. 407.]

*Criminal Law—Homicide—Information—Self-defense—Burden of Proof—Dying Declarations—Appeal—Verdict—Conclusiveness—Preliminary Examination—Waiver.*

Criminal Law—Assignment of Errors.
    1.  It is the policy of the court to construe rules of practice and of court liberally, so that all appeals may be heard upon the merits, and to this end the court, when it can ascertain what errors are assigned, will consider them.
Same—Jury Trial—Extent of Right.
    2.  In a criminal action the defendant cannot object that a particular juror was not allowed to sit in his case on a challenge for cause; his right being only that he shall be tried by an impartial jury as provided by Constitution, Article III, section 16.
Same—Preliminary Examination—Waiver—Effect.
    3.  A voluntary waiver of a preliminary examination by defendant charged with homicide has the same legal effect as though a hearing was had.
Same—Information—Leave to File.
    4.  Under Revised Codes, section 8927, providing that prosecutions in the district court must be by information, and section 8928, providing that applications for leave to file an information before examination and commitment must be made to the court on written motion by the county attorney, it is only where there has been no examination or commitment by a magistrate that the county attorney must move for leave to file an information.
Same—Evidence—Harmless Error.
    5.  Where a witness testified that he took a pistol from defendant's hand after he had shot and killed a man, but was unable to positively identify the one shown him at the trial, its admission in evidence over

objection was not prejudicial to the defendant where its identity was not questioned.

Same—Admission by Accused—Whether Voluntary.

6. A witness in a prosecution for murder testified that defendant when brought to the jail made an admission as to the shooting, and to an alternative question whether defendant's admission was voluntary, or was the result of threats, fear, etc., answered in the negative. Over objection the witness testified to what defendant had said. *Held*, that the state had made a *prima facie* showing that such admission was voluntary.

Same—Evidence—Statement of Fact.

7. The question whether witness noticed defendant, "whether he appeared to be scared or not," calls for a statement of fact, or a "shorthand rendering of facts," and is not objectionable as asking for a conclusion by the witness.

Same—Appeal—Harmless Error—Prejudice—Presumption.

8. It is for the court to determine whether an error affects the substantial rights of the parties in view of Revised Codes, section 9415, requiring the supreme court to give judgment irrespective of technical errors or defects not involving substantial rights, and it ought no longer to be the rule in criminal cases in this state that where error is shown prejudice will be presumed.

Same—Appeal—Exclusion of Evidence—Offer of Proof.

9. The burden of showing prejudice from the erroneous exclusion of evidence lies on appellant, and hence where, on a trial for homicide, the court improperly excluded, as calling for a conclusion, a question to a witness whether he noticed if defendant appeared to be scared as deceased advanced upon him, and defendant made no offer to show that the witness would have answered that defendant did seem scared, the supreme court cannot presume that he would have so answered so as to make the ruling prejudicial error.

Same—Homicide—Self-defense—Burden of Proof.

10. Under the express provisions of Revised Codes, section 9282, upon trial for murder, the commission of the homicide being proved, the burden of proving circumstances of mitigation or that justify or excuse it is on the defendant, unless the proof for the prosecution tends to show that the crime committed is only manslaughter, or that defendant was justified or excusable.

Same—Self-defense—Instructions.

11. In a prosecution for murder, where defendant claimed to have acted in self-defense, the jury was instructed that if it believed from the evidence that defendant unlawfully killed a person named, by shooting him with a pistol, "and that such killing was not in necessary self-defense, and was not under such circumstances as to be justifiable as defined in these instructions, then the defendant is guilty of murder, in the first degree." Appropriate instructions as to manslaughter were also given. *Held*, that this instruction, read with another instruction in the words of the statute, was sufficiently plain, upon the distinction between murder and manslaughter, to be understood by the jury.

Same—Self-defense—Instruction.

12. An instruction that "no man is justified in taking a human life to repel a mere battery," read with another instruction as to what circumstances will justify homicide, *held* to include all the degrees of battery making homicide justifiable.

Homicide—Dying Declarations—Weight—Questions for Jury.

13. The jury are the judges of the weight and credibility of dying declarations, and, such declarations being in the nature of hearsay testimony, the jury must consider whether a declaration introduced in

evidence is in the exact words of the deceased, and whether it correctly expresses his meaning.

Same—Apprehension of Danger.

14. An instruction: "If you believe the deceased was attempting to do some great bodily injury to the defendant, and defendant took the life of deceased in resisting such attempt, the homicide is justifiable. * * * The great bodily injury mentioned * * * is not limited to such an injury as would constitute a felony, but an unlawful beating at the hands of the assailant may be sufficient"—*held*, properly refused as ignoring the right of defendant as a reasonable man to act upon appearances as they were presented to him.

Same—Dying Declarations—Written Declarations Read to Declarant.

15. Where deceased made an oral statement in the nature of a dying declaration, no other witnesses being present who knew what had taken place, and such statement was reduced to writing and signed by the deceased, and two witnesses testified to the making of the declaration testified that it was the statement he made, it was admissible in evidence, although it was not in the handwriting of deceased, and was not read over to him before he signed it.

Same—"Dying Declarations"—Condition of Declarant.

16. The rule requiring proof that statements offered as "dying declarations" were made by declarant when *in extremis* does not require that it be shown that they were made while he was literally breathing his last, but is satisfied when it is shown that the declarant died from the wound from which he was suffering at the time they were made; and that such wound was the direct and proximate result of the act which the declarations tend to describe.

Same—Dying Declarations—Sworn to—Effect.

17. The fact that a dying declaration was sworn to does not render it inadmissible.

Same—Dying Declarations—Subsequent Operations.

18. That an operation was performed upon a wounded man after declarations offered as his dying declarations were made, *held*, in view of the other evidence, not to affect the admissibility of such declarations.

Same—Appeal—Verdict—Conclusiveness.

19. Where the evidence in a prosecution for homicide supported the conviction for murder in the second degree, the supreme court will not interfere, though on the evidence they would either have acquitted on the ground of self-defense or at most convicted of manslaughter.

*Appeal from District Court, Carbon County; Sydney Fox, Judge.*

FREDERICK BYRD was convicted of murder in the second degree, and appeals from the judgment and an order denying him a new trial. Affirmed.

*Mr. George W. Pierson*, in behalf of Appellant, submitted a brief and argued the cause orally.

The court erred in excusing witness Salminen. Trial courts are not at liberty to exercise their caprice in excusing jurors from

the trial of a case on the drawing of their names. (*State* v. *Mc-Hatton,* 10 Mont. 370, 25 Pac. 1046; *Boles* v. *State,* 24 Miss. 445; *Williams* v. *State,* 32 Miss. 389, 66 Am. Dec. 615; *Finn* v. *State,* 5 Ind. 400; *Meyers* v. *State,* 20 Ind. 511; *Van Blaricum* v. *People,* 16 Ill. 364, 63 Am. Dec. 316; *Greer* v. *Norvill,* 3 Hill (S. C.), 262.)

The court erred in modifying defendant's offered instruction numbered 4, by striking out that portion relating to the weight to be given dying declarations. Such declarations are to be received with caution, and without commenting upon the evidence the defendant was entitled to have the jury informed as to the rules applicable to their consideration. The instruction gave the rule as stated by Greenleaf. (See Greenleaf on Evidence, 14th ed., 162; *People* v. *Taylor,* 59 Cal. 640; *State* v. *Eddon,* 8 Wash. 292, 36 Pac. 139.)

The court erred in admitting in evidence a proffered written dying declaration, not being in deceased's handwriting or having been read to him, or made under the sense of impending death, and permitting the attesting clause to be read when not offered. The declaration should have been read over to deceased in order to make it admissible. (Wharton on Criminal Evidence, sec. 295; Elliott on Evidence, sec. 342; *State* v. *Fraunburg,* 40 Iowa, 555.) Where one submits to an operation, the declaration cannot be admitted. (*Peak* v. *State,* 50 N. J. L. 179, 12 Atl. 701; *State* v. *Gianfala,* 113 La. 463, 37 South. 30.) An insufficient foundation was laid for the introduction of the writing. (*Rakes* v. *People,* 2 Neb. 157; *Craven* v. *State,* 49 Tex. Cr. 78, 122 Am. St. Rep. 799, 90 S. W. 311; *Phillips* v. *State,* 50 Tex. Cr. 127, 94 S. W. 1051; *State* v. *Phillips,* 118 Iowa, 660, 92 N. W. 876; *Vaughan* v. *Commonwealth,* 86 Ky. 431, 6 S. W. 153; *Barnes* v. *Commonwealth,* 110 Ky. 348, 61 S. W. 733.)

In behalf of the State, *Mr. Albert J. Galen,* Attorney General, and *Mr. W. L. Murphy,* Assistant Attorney General, submitted a brief; oral argument by *Mr. Murphy.*

That the court did not commit error in excusing witness Salminen, see *People* v. *Majors,* 65 Cal. 138, 52 Am. Rep. 295, 3 Pac.

597; *People* v. *Abbott* (Cal.), 4 Pac. 769; *People* v. *Cebulla,* 137
Cal. 314, 70 Pac. 180; *State* v. *Melvin,* 11 La. Ann. 535; *State* v.
*Stewart,* 45 La. Ann. 1164, 14 South. 143; *Gross* v. *State,* 2 Ind.
329; *Driskill* v. *State,* 7 Ind. 338; *Smith* v. *Commonwealth,* 100
Ky. 133, 37 S. W. 586; *Hill* v. *State,* 42 Neb. 503, 60 N. W. 916;
*Spain* v. *State,* 59 Miss. 19; *Rhea* v. *State,* 63 Neb. 461, 88 N. W.
789.

MR. JUSTICE SMITH delivered the opinion of the court.

The defendant was charged by information with the crime of
murder, convicted of murder in the second degree, and sentenced
to a term of twenty-five years in the state prison. He appeals
from the judgment of the court and also from an order overrul-
ing his motion for a new trial.

The brief of counsel for the appellant is prefaced with a sort
of apology for the manner in which the transcript is prepared.
This was unnecessary. We have had no difficulty in ascertaining
what alleged errors are relied on. It should be, and is, the policy
of this court to so liberally construe rules of practice and of court
that all appeals may be heard upon the merits. No necessity
exists for any other or different procedure; the court is, to em-
ploy a homely expression, now "up with its calendar," the judges
are not particularly overworked, and so long as we can ascertain
what errors are assigned, we shall consider them, if the transcript
and briefs are in such shape as to make it possible to do so. At
the same time, the rules of court as they now exist are reasonable
and necessary for the expeditious and orderly dispatch of the
business of the court, and the judges will appreciate as strict a
compliance therewith as is possible under the circumstances of
each particular case, as their labors will be thereby greatly
lessened.

The brief of the learned counsel for appellant contains twenty-
nine specifications of error, which we shall notice in their order
of assignment.

1. One Salminen was called as a juror, and in response to ques-
tions by the county attorney said he was opposed to capital
punishment; that if he believed from the evidence beyond a rea-
sonable doubt, under the instructions of the court, that the

defendant was guilty, and the punishment, or one of the punishments, that might be inflicted was death, he was not certain whether his prejudice would influence him in arriving at a verdict; that his reason was that he felt that taking the life of any human being was wrong, and he would allow that idea to influence him in coming to a verdict. He was excused for cause on challenge by the state, and the defendant excepted. We are unable to sustain the exception. A defendant in a criminal action has no right to insist that any particular juror shall sit in his case. The extent of his right is that the cause shall be tried by an impartial jury. (Montana Constitution, Art. III, sec. 16.) No complaint is made of the jurors who finally tried the case, so that his constitutional rights were not violated. (*State* v. *Jones,* 32 Mont. 442, 80 Pac. 1095.)

2 and 3. After the state's first witness had been sworn, the defendant objected to the introduction of any evidence under the information, for the reason "that he has not been given a preliminary examination and has not been committed by a magistrate to answer any possible charge in the district court, and no written application or written motion was made by the county attorney for leave to file this information." The overruling of this objection is assigned as error. There is no merit in the assignment. The transcript shows that a complaint was filed with a justice of the peace, charging Byrd with the murder of one Rasmus Hetland; that he was arrested, brought before the justice, informed of his right to have a preliminary hearing, which he waived; and that he was bound over to the district court to answer to the charge of murder. Thereupon a commitment was signed and given to the sheriff. In view of the state of the record, we are somewhat in doubt as to the exact point intended to be made in the assignment. It is clear to us that a voluntary waiver of a preliminary hearing has the same legal effect as though a hearing had been had. Section 8927, Revised Codes, reads thus: "Prosecutions in the district court must be by information: (1) In all cases where there has been an examination and commitment or admission to bail by a magistrate on a charge of crime; or (2) in any case where there has been no examination

or commitment or admission to bail, upon leave granted by the court for that purpose." And section 8928 reads as follows: "Application for leave to file an information before an examination, commitment or admission to bail, must be made to the court on written motion, by the county attorney." It is only in cases where no examination and commitment have been had or made by a magistrate that it is necessary to apply in writing to the district court for leave to file the information.

4. There was no question but that Byrd shot and killed Hetland in front of Meyer's saloon, in the town of Joliet. He admitted the shooting. The witness Headington testified that he took a pistol from defendant's hand. He was unable positively to identify the one shown him at the trial, but said that it looked like the same gun. Over defendant's objection, it was admitted in evidence. No point was sought to be made as to the identity of the weapon, and no prejudice resulted to the defendant, so far as we can see, by its admission in evidence.

5. While Sheriff Bachelder, of Carbon county, was on the witness-stand, he testified that when the defendant was brought to the jail he made a statement with reference to the shooting of Hetland. The witness was asked this question: "And were the statements he made, or any statement he made, freely and voluntarily made by the defendant or in reply to questions by yourself or anyone else in your presence, or were they made as a result of any threats made by yourself or anyone else toward the defendant and through fear on his part or a result of any hope or immunity or offers of reward? A. No, sir; none whatever. Q. You may state what those statements were." Counsel for defendant interposed this objection: "Objected to on the ground it does not appear whether these statements were made voluntarily or not. The witness answered the question, 'No, sir.' He might answer it in the negative and in the affirmative." The court overruled the objection, and the witness answered, "He told me he killed Erasmus Hetland, and said the only thing he was sorry of was his wife and family." We think the state made a sufficient *prima facie* showing that the statement was voluntary. When the defendant was on the stand, he did not deny making

it, although his attention was called thereto. Under these circumstances, no prejudice resulted. (See *State* v. *De Hart*, 38 Mont. 211, 99 Pac. 438.)

6. Defendant at the trial relied upon a plea of self-defense to justify the killing. One witness, Chamberlain, testified that he witnessed the affair from across the street. He said that Hetland threatened to assault and whip the defendant, and that the latter backed away as Hetland advanced toward him. On cross-examination he was asked this question: "Did you notice Byrd at that time, whether he appeared to be scared or not?" The state objected on the ground that the question called for a conclusion from the witness. The court sustained the objection. This was error. This court has repeatedly decided that such questions are proper, as calling for a "shorthand rendering of facts." (*State* v. *Lucey*, 24 Mont. 295, 61 Pac. 994; *State* v. *Tighe*, 27 Mont. 327, 71 Pac. 3; *State* v. *Vanella*, 40 Mont. 326, 106 Pac. 364.) But was the error prejudicial to defendant's rights? It ought no longer to be the rule in criminal cases in this state that, error being shown, prejudice will be presumed, as was held prior to 1895 when the Codes were adopted. The former practice resulted in altogether too many reversals of criminal cases for technical errors which did not affect the substantial rights of the defendant. Section 9415, Revised Codes, provides: "After hearing the appeal, the court must give judgment without regard to technical errors or defects, or to exceptions, which do not affect the substantial rights of the parties." It is for this court to determine whether an error affects the substantial rights of the defendant. If the point can be decided from an inspection of the record, the court may act accordingly; but it is the duty of the defendant who claims prejudice to make the record so show. In this case we have no means of knowing what answer would have been returned by Chamberlain to the question propounded. If he would have answered that he did not notice the defendant's appearance, or that the latter did not appear to be "scared," then the ruling of the court carried no prejudice. If, on the other hand, he was prepared to answer that the defendant appeared to fear the deceased, such testimony

would have been material to the defendant, and its exclusion would undoubtedly have injured his case. It was within his power to place the trial court and this court in a situation to judge whether or not the answer to the question would benefit him, by offering to prove by the witness that the defendant appeared to be "scared." This he did not do. (See *State* v. *Gordon,* 35 Mont. 458, 90 Pac. 173.)

7. The witness Ray Willis testified that about three weeks before the shooting he had a conversation with the defendant, in which the latter said that Hetland had ordered him out of the mine, and, when witness asked if Hetland struck at him, he replied, "No, if he had I would have killed him." Witness suggested that, if defendant attempted to haul coal away from the mine, Hetland might waylay him. To this defendant answered, "Well, I will kill him if he does," putting his hand to his pocket. On cross-examination the witness was asked how he came to say that Hetland would waylay the defendant. He answered that it just came into his mind; that he did not think it would occur; never thought it at all; just simply asked the question. Defendant's counsel then said: "I will ask you how you came to say that? What was the occasion for it?" The court interposed: "He has answered that question. There is no use going over the same ground two or three times." Defendant excepted to the ruling of the court. The witness had in effect answered a similar question. The extent to which the cross-examination should be allowed to proceed was a matter within the sound legal discretion of the court. We find no abuse of such discretion.

8. The witness Commock had testified for the state that defendant told him on the Wednesday preceding the killing that he was going to the mine, and "if Erasmus monkeyed with him, he was going to give him something that would fix him." On cross-examination he was asked: "Do you know of Hetland excluding Byrd from the mine or driving him away?" Objected to as not proper cross-examination, and objection sustained. This ruling seems to have been correct.

9. The witness Robinson testified that he had a conversation with Byrd on the night of November 21, 1908, at the Central

41 Mont.—38

Hotel, in Joliet, in which conversation Byrd said he would kill Hetland if he did not settle with him.   The killing took place on November 22, 1908.   On cross-examination witness testified that in a conversation with defendant's attorney he had not said that he met the defendant on Thanksgiving night, but that he had said that it was on or about that time.   He was then asked, "Did you know at the time that the defendant was in jail on Thanksgiving day?"   We think the court properly ruled that this question related to an immaterial matter.

10. The witness Mitchell testified: "Byrd said that he would put Hetland out of business; that he was going up there and take nineteen cans of powder that he had on hand, and the cars, and shove them off over the end of the tipple and touch them off after working hours and put him out of business, same as himself was. He said a number of times he was going to kill him.   I told him to go to the county attorney.   He said he would take the law in his own hands.   Byrd came to my livery-stable and talked to a harness-maker who worked there.   He was there all the time nearly, right up to the time the man was killed.   Talked about killing Hetland all the time.   I could not say how many times. Q.   Did he say it six times?"   By the court: "He has already said he could not say how many times; he was talking about it all the time.   There is no use going over the same ground twice." The defendant saved an exception to this ruling.   Trial courts should be very liberal in allowing cross-examination within proper and reasonable limits in criminal cases, to the end that the defendant may not be prejudiced.   However, under the circumstances, we find no such abuse of discretion here as would appear to have resulted to the prejudice of the defendant's substantial rights.

11. The witness Brophy saw the shooting.   After detailing what took place, on cross-examination, he said, "When Hetland followed Byrd up, he raised his hand to strike him, and he was shot in that position."   On motion of the county attorney the court ruled thus: "State the position of his hands.   Strike the last part of the answer out."   We take this to mean that the

words "to strike him" were stricken out. The ruling was extremely technical, but we find no prejudicial error in it. Leave was granted to examine the witness as to the position of Hetland's hands.

12. The witness Meyer testified that on one occasion, in his saloon, when Hetland was not present, Byrd said that if Erasmus Hetland did not settle with him for his claim in the mine "he would fix him; he would kill him." On cross-examination he was asked, "When was the day he and Hetland had trouble in your saloon, in your presence?" This question clearly related to an occasion other than the one mentioned in direct examination when Hetland was not present, and an objection thereto for that reason was properly sustained.

13. Specifications of errors 13, 14, 15, 16, and 16a deal with the question whether the cross-examination of the witness Meyer was improperly curtailed. We have carefully examined all of these specifications of error, and conclude that the action of the court in this regard was sufficiently liberal to allow all material points to get to the jury.

14. Complaint is made of the action of the court in refusing to allow the witness Henry to testify that he warned the defendant to keep away from Hetland, and that defendant said he was afraid of the man whom he afterward killed. If this was error, it was cured by the subsequent action of the court in allowing Henry to give the testimony which was at first excluded.

15. Witness Farrell testified that he had two conversations with Byrd, in which the latter complained of the treatment he had received from Hetland in their mining operations and said he expected to have serious trouble if he did not get a settlement of the difficulties. He was asked on cross-examination, "At this time you knew that Hetland was a very quarrelsome man, didn't you?" This question was objected to as not proper cross-examination. We think the ruling of the court sustaining the objection was correct.

16. Defendant complains of the action of the court in excluding from the consideration of the jury the written agreement con-

cerning the mine which he had entered into with Hetland. This paper-writing might properly have been admitted; but we are satisfied that the testimony of the defendant thereafter given was amply sufficient to illustrate to the jury the relation which deceased and defendant bore to each other with regard to the mine prior to the day of the tragedy.

17. Defendant testified: "I heard the testimony of George Mitchell. I never mentioned a word to him, and never said I would kill Hetland, and never said I would blow up the tipple. Mitchell told a falsehood clean through. Q. Did you ever make any such statement? A. No, sir; what would I want to blow up my own place for?" This last answer was by the court stricken out; but there was no prejudice in the action, because the defendant had already very forcibly answered a similar question.

18. The court instructed the jury as follows: "(9) Upon trial for murder, the commission of the homicide by the defendant being proved, the burden of proving circumstances of mitigation, or that justify or excuse it, devolves upon the defendant unless the proof upon the part of the prosecution tends to show that the crime committed only amounts to manslaughter, or that the defendant was justifiable or excusable." This instruction is in the words of the statute (Revised Codes, section 9282), and was properly given.

The court also told the jury: "(12) If you believe from the evidence in this case beyond a reasonable doubt that the defendant, Frederick Byrd, on or about the twenty-second day of November, 1908, at the county of Carbon, state of Montana, did unlawfully, willfully, feloniously, deliberately, premeditatedly, and of his malice aforethought, kill and murder Rasmus Hetland in the manner and form as charged in the information, by shooting the said Rasmus Hetland with a pistol or revolver as is described in the information, and that such killing was not in necessary self-defense, and was not done under such circumstances as to be justifiable as defined in these instructions, then the defendant is guilty of murder in the first degree, and you will so find by your verdict."

As to these two instructions, taken together, counsel says: "The defendant is presumed to be innocent until the contrary is shown beyond reasonable doubt, and in this case deceased began the affray, according to all the evidence excepting his dying declaration, and the jury should not have been left to themselves to draw the distinction for themselves, and concluded from the general definitions when the burden of proof was cast upon defendant. And, furthermore, the defendant was entitled to an instruction, and it was the duty of the court to particularly call the attention of the jury to the distinction between murder and manslaughter, as the evidence clearly shows defendant was retreating and being followed by deceased in a threatening attitude at the time he fired." We think the instructions are sufficiently plain to enable a person of ordinary understanding to know what they mean. If the defendant desired any explanation thereof, he had the opportunity to tender an instruction embodying his views. The court gave appropriate instructions defining murder and manslaughter, and told the jury that the defendant might be convicted of the latter crime.

It is further objected to instruction No. 12 that it "excludes the condition of excusable homicide, or a reasonable ground to apprehend a design to do some great bodily harm; it being an instruction directing the jury to find a verdict of guilty if they found certain things, it should include every factor of the case." But the court, in other instructions, covered the question of "excusable homicide and a reasonable ground to apprehend a design to do some great bodily harm." It is not necessary for the court to cover every phase of the case in a single instruction. They should be read and construed together.

19. Instruction No. 13 reads as follows: "You are instructed that no man is justified in taking a human life to repel a mere battery, and that the apprehension of no danger other than to save the life of the slayer, to prevent the commission of some felony, or to save the slayer from great bodily harm, will justify a homicide." This criticism is offered thereto: "All batteries must be mere batteries or beatings. The right of self-defense

should not have been so limited or the burden cast upon defendant to determine if the threatened battery was to be a mere battery." The court, however, by instruction No. 7, told the jury in the words of the statute under what circumstances homicide is justifiable. The words are plain and do not include resistance to an attempt to commit any lesser degree of battery than those therein specifically mentioned.

20. Defendant's counsel tendered the following instruction: "You, the jury, are the judges of the weight and credibility to be given dying declarations. Such declarations are in the nature of hearsay testimony, and you are to consider whether the declarations introduced in evidence are the exact words used by the deceased, or whether they correctly express his meaning, or whether the witnesses who testified to such declarations correctly understood the deceased, whether they remember the words and meaning, and whether the words attributed to deceased were in fact spoken by him. [Though these dying declarations, when deliberately made, under a solemn and religious sense of impending dissolution, and concerning circumstances in respect of which the deceased was not likely to have been mistaken, are entitled to great weight, if precisely identified, yet it is always to be recollected that the accused has not the power of cross-examination— a power quite as essential to the eliciting of all the truth, as the obligation of an oath can be—and that where the witness has not a deep and strong sense of accountability to his Maker, and an enlightened conscience, the passion of anger and feelings of revenge may, as they have not infrequently been found to do, affect the truth and accuracy of his statements, especially as the salutary and restraining fear of punishment for perjury is in such cases withdrawn. And it is further to be considered that the particulars of the violence to which the deceased has spoken were in general likely to have occurred under circumstances of confusion and surprise, calculated to prevent their being accurately observed and leading both to mistake as to the identity of persons, and to the omission of facts essentially important to the completeness and truth of the narrative.]" The court gave the first portion

thereof, but refused to give that part, marked in brackets, beginning with the words, ''Though these declarations,'' etc. We think the instruction as given fully and fairly covered the whole matter sought to be impressed upon the minds of the jury. It is said that the instruction as tendered is in the exact words employed by Professor Greenleaf, in his great work on Evidence. This is true; but the argument therein found was intended by the learned author for the general consideration of courts, and was not designed to be given to jurors in particular cases. Whether a declaration is entitled to great weight, or any weight, is, in this jurisdiction, a matter for the jury to decide.

21. Instruction No. 7, tendered by the defendant, reads as follows: ''You are instructed homicide by a person is justifiable if committed when resisting any attempt to murder any person, or to commit a felony, or to do some great bodily injury upon any person; and in this case if you believe the deceased was attempting to do some great bodily injury to the defendant, and defendant took the life of deceased in resisting such attempt, the homicide is justifiable and you should acquit him. The great bodily injury mentioned in this instruction is not limited to such an injury as would constitute a felony, but an unlawful beating at the hands of the assailant may be sufficient even when the assault is lacking in some of the elements of felony.'' No error was committed in refusing this instruction. It ignored the right of the defendant, as a reasonable man, to act upon appearances as they were presented to him, and was far less favorable to him than were other instructions, correctly setting forth his right, which the court gave. (See *State* v. *Rolla,* 21 Mont. 582, 55 Pac. 523, and *State* v. *Sloan,* 22 Mont. 293, 56 Pac. 364.) We think the jury must have understood from the court's charge that the defendant would not only have been justified in killing the deceased in case the latter was in fact attempting to murder him, or to do some great bodily injury upon his person, as well as in the event that defendant as a reasonable man had reasonable ground to apprehend that such was the case.

22. The following instruction was tendered and refused: ''Before a juror should find a defendant guilty of a crime, he should

be so convinced of the guilt of the accused that he, the juror, would be willing to act upon such conviction in matters of the highest interest and greatest concern to himself; and whenever the state of the proof is such that every necessary fact, constituting the offense charged, is not made so evidently to appear from the evidence, that a man of common prudence would act thereon without hesitation, or when consideration of the evidence does not produce that degree of certainty in the mind of a reasonable man, which excludes every reasonable possible construction placed on the acts of the accused, other than that of guilt, a reasonable doubt exists, and the defendant is entitled to an acquittal.'' The subject of this instruction is ''reasonable doubt,'' and was fully covered by the court in an instruction given, which defines that most confusing expression in a manner many times approved by this court, since the case of *Territory* v. *McAndrews,* 3 Mont. 158, was decided in 1878.

23. Dr. W. H. Allen testified: ''Hetland made a written statement in my presence before his death, relating to the cause of his death and the circumstances thereof. The statement was not written by himself, but by someone else. It was all written by me, except the signature and one line of the date. Mr. Hetland made several statements previous to the writing of this declaration that he was positive that he would never recover from these wounds. I advised him of his physical condition and that recovery was improbable before the writing of the statement. He made the mark there with the cross. The statement was written before Hetland was operated on. I considered the operation the only chance he had. This was explained to him, there was a possible chance of his recovery. He made the statement several times he was almost positive he was going to die. I told him the operation was the only possible chance. He made the statement several times he would never recover. That was before anything was said of the operation. He never regained consciousness after the operation.''

J. M. Willis, justice of the peace, testified: ''That is my signature at the bottom of the declaration. That is a statement of Mr.

Erasmus Hetland when he [was] on his bed, you might say dying bed, I suppose, the statement he made." The statement as offered reads as follows:

"Joliet, Montana, Nov. 22, 1908.

"Being wounded and feeling that I am in great danger of death I make the following affidavit, to-wit: Left my home in Joliet, Carbon Co., Mont., at 9:30 a. m. on Sunday, Nov. 22, 1908, went down into town, met Frederick Byrd in front of Meyer and Cuno saloon, I said good morning to him. I told him I had been up all night and had to take my wife to the hospital at Bridger. He said he would go out to the mine. I told him I was tired of his coming to the mine, and did not want him to come any more. His answer to that was three shots. I did not lay hands on him nor make any motion to strike him. I considered that the shooting was without provocation and without cause.

his

"ERASMUS   X   HETLAND.

mark

"Witness: LEWIS HETLAND.

"Erasmus Hetland being duly sworn deposes and says that the above statement is true to the best of his knowledge and belief.

"Sworn to before me this November 22, 1908.

"J. M. WILLIS,

"Justice of the Peace."

Defendant objected to the introduction of the statement in evidence for the following reasons: (1) Because it was not shown that Hetland had lost all hope of recovery, or that the declaration was made under a sense of impending death; (2) that it contains statements not relating to the cause of death and recites the opinion of Hetland; (3) it also recites statements that were no part of the conversation between Byrd and deceased, no part of the *res gestae;* (4) it appears that the declaration is not in the handwriting of Hetland, and there is no evidence that it was read to him; (5) it was not made to appear that Hetland was a competent witness capable of testifying; (6) because there were several eye-witnesses to the affray, and therefore a dying declaration

ought not to be received. The court overruled the objection, and defendant's counsel then moved to exclude certain portions thereof from the consideration of the jury. The court excluded certain parts of the statement, and we are unable to determine from the record what parts were so excluded; but it appears that that portion beginning with the words "I considered" was not read. The only material portion of the statement remaining reads thus: "His answer to that was three shots. I did not lay hands on him nor make any motion to strike him."

The first contention of the defendant on this branch of the case is that the statement was inadmissible, for the reason that the testimony fails to show that the writing was read over to the deceased before he signed it. He cites the case of *State* v. *Fraunburg*, 40 Iowa, 555. In that case, however, the court remarked that the declaration was not signed by deceased and was a mere memorandum of what he had stated, taken down by the justice of the peace. In other words, that it was not the statement of the deceased, but of the justice, who might have used it to refresh his recollection in giving oral testimony of what the deceased said. 1 Elliott on Evidence, section 342, is also called to our attention. The author there says: "The writing cannot be put in as the declarant's statement unless it has been read over and assented to by him, though it can be used by the writer to refresh his memory as a record of his recollection of the oral statements of the declarant." We understand from the authorities that the courts have always been very careful to first ascertain whether the declaration offered in evidence is in fact the statement of the deceased, and that the rule contended for by the defendant should extend no further than is necessary in order to place the court in possession of this information. In the case at bar none of those present at the bedside of Hetland were witnesses to his encounter with the defendant. He was the only one present who knew what had taken place. He made an oral statement which was reduced to writing by Dr. Allen, and Hetland thereupon signed the same. Dr. Allen and Mr. Willis both say, "That is the statement he made." The statement is brief and not at all complicated.

Either of the witnesses might have been allowed, under all the authorities, to give oral testimony as to what was said. We are not inclined to make nice distinctions between a written statement and oral testimony; or between oral evidence that deceased made the specific declarations contained in the paper-writing, and the categorical averment, "This is his statement."

But it is said that the statement was not made under a sense of impending death. We think the proper rule for the admission of alleged dying declarations is well stated by Mr. Justice Fullerton, of the state of Washington, in the case of *State* v. *Power*, 24 Wash. 34, 63 Pac. 1112, 63 L. R. A. 902, thus: "The witness testified: 'That in the course of this conversation the deceased said that she knew that she could not last long unless there was something done for her; that she did not think that she would ever be taken out of the room where she was lying, until she was packed out; that she could feel her strength leaving her rapidly; that when the witness tried to encourage her, telling her that she must live in hopes, the deceased answered that she had lived in hopes long enough, that she had given up all hopes. She did not say that she believed she was going to die, or that she could not live any longer, or use words to express her belief of her approaching death.' The rule requiring it to be shown that the declarations were made while the declarant was *in extremis* does not require that it be shown that they were made while the declarant was literally breathing her last. The rule is satisfied when it is shown that the declarant died in the course of the illness from which she was suffering at the time they were made, and that the illness from which she was suffering was the direct and proximate result of the original injury which the declarations tend to illustrate. It is true that it was not shown that the declarant said, in so many words, that she believed she was going to die, or that she could not live longer; but this was not necessary. The question to be determined here is: Was the trial court justified in believing, from the nature of the evidence, that the declarant believed she was about to die and was without hope or expectancy of recovery? This conclusion must be drawn from the entire

statement and the conditions surrounding the declarant, and not from any specific words she may have used.''

In *Keaton* v. *State,* 41 Tex. Cr. 621, 57 S. W. 1125, it was said: ''There is no form of phraseology in which a party making a dying declaration must indicate the fact that he is conscious of approaching death. So this is done with reasonable clearness it is sufficient. We said, in *Miller* v. *State,* 27 Tex. Cr. App. 80, 10 S. W. 447: 'It is enough if it satisfactorily appears in any manner that they [referring to dying declarations] were made under that sanction, whether it be directly proved by the express language of the declarant or be inferred from his evident danger or the opinion of medical or other attendants stated to him, or from his conduct or other circumstances of the case, all of which are resorted to in order to ascertain the state of the declarant's mind.' ''

In *Winfrey* v. *State,* 41 Tex. Cr. 538, 56 S. W. 919, the Texas court of criminal appeals said: ''The court must draw a rational conclusion from all that was said, taken in connection with such surrounding circumstances as must have been known to the declarant, as to whether such declarant was in such a condition of mind as would render his declaration competent.''

The supreme court of Nevada said, in *State* v. *Roberts,* 28 Nev. 350, 82 Pac. 100: ''That dying declarations must be made under a sense of impending death in order to be admissible is well illustrated by the decided cases; but this may be shown, not only by what the injured party said, but by his conduct and condition, and by the nature and extent of his wounds, and it is sufficient if these show that the declarations were made without expectation of recovery and under a sense of impending death, notwithstanding the declarant may not have said that he was without hope or that he was going to die. * * * The controlling point here is a question of fact for the court—the state of mind of the deceased at the time he made the statement. * * * ''
(See, also, *State* v. *King,* 104 Iowa, 727, 74 N. W. 691; *State* v. *Boggan,* 133 N. C. 761, 46 S. E. 111; *State* v. *Craig,* 190 Mo. 332, 88 S. W. 641.)

We think the trial court was justified in believing from his oral declarations and all the surrounding facts and circumstances, that Hetland thought he was about to die. His dying declaration was therefore properly admitted. The fact that it was sworn to does not render it inadmissible. (*State* v. *Carter*, 106 La. 407, 30 South. 895.) The further circumstance that an operation was afterward performed upon the wounded man does not, in view of the other facts, change our opinion as to the admissibility of the declaration.

24. It is finally suggested that the evidence is insufficient to justify a verdict of murder. No useful purpose would be served by encumbering the reports with a recital of it, even in substance. Because of the numerous specifications of error, each one of which we have felt it our duty to notice particularly, this opinion has already become lengthy. In our judgment, there is barely sufficient evidence to justify a verdict of murder in the second degree, while the great preponderance seems to indicate that defendant should either have been acquitted on the ground that the homicide was justifiable, or should, at most, have been convicted only of manslaughter. The jury were the judges of the weight to be given to the testimony. Unless we can say that the evidence was insufficient to justify the verdict, we have no power to interfere. We cannot say that. We may not substitute our judgment for that of the jury. We do think, however, that the attention of the governor might properly be called to the case, at some future time.

The judgment and order of the district court of Carbon county are affirmed.

MR. CHIEF JUSTICE BRANTLY and MR. JUSTICE HOLLOWAY concur.