THE STATE OF KANSAS, *Appellee*, v. HENRY HOERR, *Appellant*.

No. 18,003.

SYLLABUS BY THE COURT.

1. JURORS — *Qualifications — Knowledge — Rumors—Newspaper Reports.* Where the fact that a burglary had been committed in robbing a bank was notorious and unquestioned, opinions of persons called as jurymen that the bank had been broken into and robbed did not disqualify them from service on the jury in the trial of one charged with the crime.

2. ———— *Same.* The facts that a person has read newspaper reports of a burglary, and heard general talk about it, do not necessarily disqualify him for jury service if he has no settled conviction of mind nor opinion of a positive and fixed character upon a material disputed fact or issue to be determined, and if he is free from prejudice, bias or interest.

3. BURGLARY—*Conspirators—Evidence—Associations.* Where a burglary is committed by several persons, some of whom may have actively participated at the time and place, others counseling, aiding and abetting, and one alone is on trial, evidence of his association with others tending to show a guilty combination or conspiracy, when limited to a reasonable time before the burglary, is admissible.

4. ———— *Same.* Evidence of the identification of such associates and the presence of some of them at or near the place of the burglary was competent, and the fact that some of these associates were identified as persons afterwards seen in jail being an incident of their association and identification, is not objectionable.

5. EVIDENCE—*Not Prejudicial.* Several items of testimony erroneously admitted are considered and found to be unimportant, and it is held that the substantial rights of the defendant were not affected by the admission of such testimony.

6. ———— *Same.* It is competent to contradict a witness in a criminal case by reading a statement from his deposition previously taken and filed, after properly calling his attention to the statement.

7. INSTRUCTIONS—*Personal Presence of Defendant—Concealing the Crime.* Instructions which require the state to prove that the defendant, if not personally present when a crime was committed, counseled, aided or abetted in its commission, by actually helping, confederating with and assisting others in

the plan and purpose *and* knowingly concealing the crime and aiding the escape of the perpetrators, place an unnecessary burden on the state. Proof of concealment is not essential to a conviction where the accused has counseled, aided or abetted in the commission of a crime (Crim. Code, § 115), but the defendant was not prejudiced by the error.

Appeal from Marshall district court. Opinion filed January 11, 1913. Affirmed.

*L. W. Colby,* of Beatrice, Neb., for the appellant.
*John S. Dawson,* attorney-general, for the appellee.

STATEMENT.

This appeal is from a conviction for breaking into and stealing from the Beattie State Bank.

The crime was committed a little before three o'clock on the morning of November 8, 1910, by five armed men, who broke into a rear door of the building, blew open the safe, and took away about $3500 in money. A part of the burglars stationed outside the building fired occasional shots while others worked inside. Several explosions occurred. The evidence tended to prove the following facts: After the firing ceased the robbers were seen going northward, one carrying a bag. They were tracked to a gap in the hedge at the roadside, a mile and a half from the bank. Just inside the gap tracks were found showing that an automobile had passed in, turned around, and indicated that it had stood for some time near the hedge and had passed out into the road. The tracks were those of knobby tires, that is, of tires having raised diamond-shaped knobs upon them, leaving indentations in the tracks. The left rear wheel made what is termed a wobbly track. This and the diamond-shaped indentations enabled the pursuers to follow the track, which they did, in a general northerly course, then west through Wymore, Neb., and on northeasterly past a place called the chicken ranch. About four miles beyond that ranch the car carrying the pursuers broke

down and the track was lost.  A little after six o'clock on the morning of November 8 a red car carrying five men was seen in the vicinity of Wymore going at the rate of thirty-five or forty miles an hour.  It left diamond-shaped indentations in its tracks.  A car carrying three men was seen about 6:15 or 6:30 o'clock on the same morning going past the chicken ranch.  It swung in toward the entrance of the ranch, but whether it stopped there the witness could not tell, because of an intervening obstruction of the view.  Other witnesses saw a red car in this vicinity between Kinney and the chicken ranch, also going at the rate of thirty-five or forty miles an hour.  Two men were in the front seat and one in the rear, but it was too dark to distinguish faces.  One witness describes the tracks of this car as indented with diamond-shaped knobs.  A little after eight o'clock the same morning a red car of the same general description was seen coming from the west, which turned in before the barn on Alex Muenard's farm about two miles south and east of Wymore, and two or three men were seen working around it.

The defendant is a resident of Wymore, where he lived for over three years with his wife and five children in their own dwelling.  In the early part of the summer of 1910 he worked in a stone quarry, but had no visible employment after some date in July.  He associated with a group of men consisting of Dan Carney, called Crippled Dan, and sometimes known as Grant Shirley, and also as Joe Fisher; Mulcahy, also called Ryan; Watson, designated as "Red" Edwards, or Black, called "Blackie" by some; Carlisle, otherwise known as Crawford, or Clyde Crawford; Wheeler, Jackson and perhaps some others.  These men, or some of them, were frequently with the defendant at his home, on the streets, and at saloons in Wymore in the summer and fall of 1910.  They were sometimes designated as "John Boys."  Carney was lame.  In July, 1910, Dan Carney

and two others of those associating with the defendant were seen going toward the railroad bridge at Wymore, carrying a spade and something heavy, which appeared to be a suit case. They returned in two or three hours. In the latter part of July a place was found where digging had been done under a tree near the bridge, and near by a new shirt was found which had been torn up and the sleeves torn out. Digging down at this place the residue of dynamite sticks was found—the remnants remaining after the nitroglycerine had been extracted—wrapped in pieces of paper. Sometime in October the defendant said, in talking about dynamite, that "A fellow could take rain water and heat it and separate this from dynamite and get nitroglycerine on top and pour it off." A box of dynamite was found under a box car near the stone quarry at Wymore in October or early in November. The defendant was told of its presence there and the request was made that one of the boys should take it away. He made no answer. The next day it was gone, and soon afterwards a like box of dynamite was found in the quarry in a hole in the sand covered over with manure.

On November 4, 1910, the defendant rented from the owner the chicken ranch consisting of about two acres of land with a dwelling house adjacent to Wymore. He was accompanied by two men whose identity does not appear. A written lease was given for one year at $10 per month. Two days afterwards three men were found at the ranch, but the defendant was not there. A red automobile was seen by the side of the barn on the ranch. It was seen there at other times before November 7. About November 25 two or three men were found at the place by the owner. One of the men was Mulcahy. The owner was taking a harness from the barn, when Mulcahy came out with another man and asked, "What are you doing?" Before the month was up the defendant informed the owner that the distance was too great for his children to walk to

school, and gave up the lease.   The ranch was three or four blocks from the defendant's home in town.   Early in November Watson purchased bacon and other provisions of a grocer.   The receipted bill for these goods was found in the house at the chicken ranch after the burglary.   Three men, one of them being Mulcahy, were seen at the ranch on November 7.   A small load of furniture was hauled from the ranch, going south toward the defendant's house.   On the third day of November the defendant, with Watson, Mulcahy and Crawford, came into Wymore from the north in an Oakland 40, red, two-seated automobile with top, Crawford driving, and placed it in a storeroom adjoining O'Donnell's saloon.   A door opened from the rear room of the saloon to the storeroom.   The men were in the saloon on Saturday, November 5.   On the 4th or 5th of November Watson, Carney, Blackie, Mulcahy, Crawford, Joe and the defendant were in the storage room; Crawford was fixing something on the front end of this car.   The defendant was seen to unlock the door at different times and pass from the saloon into this storage room.   Sometime early in November Dan Carney and Alex Muenard rode in Muenard's wagon a little way out of Wymore and met the defendant riding around in a circle on a bicycle.   Carney alighted, talked with the defendant.   Muenard said, "Good-bye, Joe (to Carney), don't get hurt," and drove away.

On November 11 at the defendant's residence a bill of sale of an Oakland 40 automobile was executed by Crawford to the defendant, stating a consideration of $1000, witnessed by his wife and two other persons. The defendant then went to O'Donnell's saloon and asked the proprietor to sign his name also as a witness, which was done.   Another person was also asked for his signature as a witness, and he testified that the defendant then said that he wanted "to fix it with me so that it would be all right when the time came," and

37—88 KAN.

that a conversation was held indicating a plan of the defendant to have the amount and kind of money and the persons present fixed up to explain the purchase of the automobile. The witness testified that he refused to sign the bill of sale when requested in the circumstances stated. His signature nevertheless appears upon it, which he explained by saying that he did sign another paper listing his place for sale, which the defendant represented that he wanted to show that he was in the real-estate business. After this bill of sale was made the defendant assigned it in writing to his wife and gave an order to Mr. Muenard for the car described in it, and it was brought to Wymore from Muenard's barn and placed in a garage. He tried to sell it for a less sum than $600, and also offered to trade it for other property. It was afterwards examined and found to have diamond-studded tires and an axle so bent as to make a wobbly track. While the car was still at Muenard's the defendant requested a witness to take it out farther in the country, to the premises of a brother of the witness, and cover it over with hay at the side of a stack, but this was not done. The top of the car was found at the chicken ranch some time after the burglary.

A dynamite cap and fuse, a revolver and a box of cartridges, caliber .45, were found at the chicken ranch, together with a price list issued by the Oakland car company, also a covering for the eyes used by automobile drivers, and a suit case containing shirts and ties; some articles of clothing and pieces of furniture were also found in the house.

Dan Carney and Wheeler were seen in Beattie in company with another stranger on the 4th or 5th of November. Carney was selling lead pencils. On one of these days Carney and two other strangers purchased a box of cartridges, caliber .45, at a store in Beattie. On the same day a person identified by the storekeeper as the defendant came with two others into the store and

had a conversation with a local candidate, who offered them his card. The defendant said, "I am a stranger here." A bullet fired by the burglars in Beattie was picked out of a building where it had lodged, and found to be caliber .45. The box containing the cartridges sold to Carney was found empty near the place where the automobile had stood within the gap in the hedge. A torn piece of wall paper was found at the same place, of the same pattern as the wall paper in the house on the chicken ranch, some of which had been torn off.

Testimony on the part of the defendant tended to show that he was seen in Wymore on the evening of November 7, as late as ten o'clock, and the next morning about six or 6:30 o'clock. A witness, who was present in the hardware store in Beattie when the man identified by the proprietor as the defendant came in, testified that he was the candidate referred to as being present, that he saw the man and offered him his card, which he declined, and that the defendant was not that man. In his own behalf, the defendant testified that he had never been at Beattie and denied having anything to do with the burglary. He testified that he let Mr. Edwards have the use of the chicken ranch because he had no place to go, and that Edwards let him have some furniture, which was moved from there when he left. It was given up because the distance was too far for the children to go to school. He explained his presence at O'Donnell's and other saloons by the fact that he was electioneering for a Nebraska candidate for a state office, and using election money in furnishing beer for the boys on the day before the election and for some time before. He denied having a key to the storage-room door opening from the saloon, but said he once used a nail in opening it for another man to go in for trucks to move a piano. He testified to the purchase of the car from Crawford and that he paid $600 for it. His wife testified that she had kept

boarders, among them Crawford and three others of
the men referred to as her husband's associates.   She
testified to the purchase of the automobile and the
making of the bill of sale, and said that she furnished
about $400 of the $600 paid for it, part of which was
from the sale of her home.   She explained that as they
had sold their home they needed a place to move into
when the chicken ranch was rented, but that she knew
nothing about the lease until after it was made, when
she objected because it was too far for her children to
walk to school.   She said her husband was at home the
7th and 8th of November, 1910, and was at home the
night of the 7th.   She knew that the car was out at
Muenard's when purchased, and she had ridden in it
with Crawford and her husband.

The opinion of the court was delivered by

BENSON, J.: The appellant presents fifty-six assign-
ments of error.   Eight of these assignments are upon
rulings made on challenges to jurors.   Several jurors
stated their belief that the bank had been robbed.   This
was a notorious fact that citizens of the county must
necessarily have believed, accompanied as it was by a
fusilade and explosions.   It was not disputed in the evi-
dence and was proved beyond possible doubt.   An opin-
ion that the burglary had been committed did not,
therefore, disqualify.   (*The State v. Spaulding,* 24 Kan.
1; *The State v. Stewart,* 85 Kan. 404, 409, 116 Pac. 489;
*The State v. Olsen,* ante, p. 136, 141, 127 Pac. 625.)

The examination of the jurors concerning their
opinions upon other incidental matters showed that,
while they had read newspaper reports and heard con-
siderable talk, they were not disqualified within the
principles stated in *The State v. Morrison,* 67 Kan.
144, 72 Pac. 554; *The State v. Truskett,* 85 Kan. 804,
118 Pac. 1047; and more fully in *The State v. Stewart,*
supra.   It does not appear that there was any settled
conviction of mind or opinions of a fixed and positive

character upon a material disputed fact or issue to be determined, or that there was any bias or prejudice against the defendant, or that the court did not exercise a just discretion.

Objections were made to the endorsement of names of witnesses upon the information after the case was called for trial. It is unnecessary to refer to the rulings in detail. They were all within the discretion of the district court, which was fairly exercised. The views of this court relating to this subject, recently stated in *The State v. Tassell,* 87 Kan. 861, 126 Pac. 1090, are applicable to this case, and are followed.

Error is assigned upon remarks of the prosecuting attorney in his opening statement, and others are predicated upon the admission of testimony relating to evidence showing the association of the defendant with Carney, Mulcahy and others mentioned in the preceding statement of facts. No error is perceived in these rulings. The burglary was committed by several. Two of these associates were identified by witnesses as being at Beattie three or four days before the crime was committed. A witness testified that the defendant himself was in Beattie at the same time that the others were seen there. The criminals escaped in an automobile, traced to the defendant's possession afterwards. Several of these associates were seen with him, using and fixing this car, a short time before the burglary. He rented the chicken ranch and it was occupied just before the burglary by some of these men. The automobile top was found there. One of these men and the defendant entered into the transaction wherein the bill of sale was given with unusual formalities and accompanying suggestions as to the kind of money and the persons present, indicative of a purpose to prepare available proof for use when needed. In view of these and other circumstances, testimony showing the defendant's close association with these men for a reasonable time preceding and continuing down to the date of the

crime was admissible. It was proper to show the defendant's employment, conduct, whereabouts and associations. It appears that some of these men were brought to Kansas and were in jail at Marysville when they were identified by witnesses. This testimony is objected to as tending to prejudice the defendant by showing their incarceration in jail and prosecution for crime. The objection can not be sustained. The evidence was admissible for purposes of identification. Their whereabouts is not of particular importance, but it is impossible to produce such evidence wholly apart from time and place. A witness was allowed, over defendant's objection, to testify that defendant had said that he was boarding the kind of men that had money. This occurred in this wise: After a trial of Mulcahy on some charge the defendant objected to having his name mentioned, as he said, "with a bunch of crooks." The police judge remarked that he did not see him do any work, and thereupon the defendant said that he kept a boarding house and was boarding the kind that had money. The men or some of them already mentioned were among his boarders. In the light of the circumstances, and as part of the conversation, the remark objected to was admissible. It was the defendant's own explanation of his associations.

Testimony is also objected to showing that along in August the defendant threw a flash light upon persons sitting at night in the rear of his premises, at the same time having a revolver in his hand. This is not very important evidence, but it shows the defendant's possession of the instrumentalities referred to, and was admissible in connection with all the circumstances proven.

The conversation of the defendant concerning the manner in which nitroglycerine could be extracted from dynamite, although objected to, was admissible, as also was the evidence relating to the buried dynamite sticks, the dynamite found under the box car and in the

stone quarry, the cap and fuse found at the chicken ranch, the receipt for groceries and price list of Oakland cars and other articles found at the same place, with the evidence of the other facts and events preceding the crime contained in the preceding statement. Some of these matters bear very remotely on the case, but are admissible when considered together to show a guilty combination tending to prove the defendant's complicity in the crime charged.

Special reference ought perhaps to be made to the admission of evidence concerning the arrest of Black, Jackson and Watson, to which an objection was made. These men were arrested at Hoerr's home in July, 1910, for stealing silks. Complicity of the defendant in the alleged theft was not shown, nor does any connection appear between the larceny then charged and the crime now under investigation. The evidence relating to that matter, however, did not close with the arrest. Hoerr went to the jail where the men were taken, offering to procure counsel for them, and afterwards, when they were taken to Concordia in this state, it appears that he went there on the same errand. While at Concordia, the next day after the arrest, he told the sheriff that he had written to Dan Carney in answer to a letter received by these men while in jail. This evidence was not offered to prove another crime or the defendant's possible participation in it; for such purpose it was not admissible, but it was permissible in the discretion of the trial court to further show the defendant's associations.

Matters of evidence of doubtful admissibility will now be referred to. Testimony was admitted of the sale of a coat and pair of trousers by the defendant in July, 1910. It is not indicated how this circumstance is connected with anything material to the case.

On the cross-examination of the defendant, who was a witness in his own behalf, he was shown a promissory note made by him in Louisiana in the year 1903,

and his letter to the payee promising payment, and was asked if he had received a letter from a bank in Wymore asking him to call and pay the note. The note and letter were received in evidence. Nothing in his testimony in chief referred to this note, or warranted the cross-examination. No reason is given for it except the suggestion that it tended to rebut his statement that he had money to pay for the automobile which he claimed to have purchased.

Dan Carney was arrested in Oregon "recently," the sheriff said in giving his testimony, but the time is not shown. The court admitted his statements to the officer that he went under various *aliases* and that skeleton keys in his possession were watch charms. These statements, made months after the burglary, were erroneously received. The keys were also erroneously admitted in evidence. These items of evidence which we have characterized as doubtful were improperly admitted, but we do not find that any of it was prejudicial. The transaction concerning the sale of clothing appeared to be entirely innocent, and we must presume was so considered. The cross-examination about the note revealed nothing except that the defendant was in debt, which was of no consequence, and it can not be presumed that a jury would draw any unfair conclusion from it. The statement of Dan Carney that he went under other names was not prejudicial for that fact had been proven already. The statement that the skeleton keys were used for watch charms was his little joke, which could have no weight. The production of the keys was of no more consequence than his statement about them. Probably in producing the mass of evidence presented in this case these particular items of testimony were admitted upon the belief that some connection would be shown to make them entirely competent. The failure to do so can not be grounds for reversal under the code of criminal procedure, which requires this court to disregard errors which do not

affect substantial rights. (Crim Code, § 293; *The State
v. Morton,* 59 Kan. 338, 52 Pac. 890; *The State v. Con-
·nor,* 74 Kan. 898, 87 Pac. 703; *The State v. Hammon,*
84 Kan. 137, 146, 113 Pac. 418.)

An objection that the cashier who testified to the·
correctness of ledger entries showing the amount of·
money in the bank when burglarized, based upon the
fact that he did not personally make the entries, can.
not be sustained. The evidence was admissible; besides,
the amount is not material. Breaking with intent to
steal is sufficient to sustain a charge of burglary.

The defendant took the deposition of one Owen but
did not read it as Owen was present and testified. His
testimony was to the effect that a witness who had re-
lated the occurrences at the defendant's house when the
bill of sale was made out was not present there. His
attention was called to his deposition in which he had
stated that the witness was present, and on rebuttal
that part of his deposition was read. Of this the de-
fendant complains, but without cause. He could be
thus contradicted by his written statements as well as
by oral ones.

Some testimony offered in rebuttal purporting to·
repeat statements made by Muenard concerning his
possession of the automobile is objected to. It appears,
however, that this testimony was received in rebuttal
of Mr. Muenard's statements as a witness for the de-
fendant, and for this purpose it was admissible.

The defendant predicates error upon instructions
given and refused. The subjects covered by the re-
quests were fairly treated in the instructions given,
and covered every correct proposition fairly. Instruc-
tions requested relating to the defense of alibi were·
properly modified in accordance with the statute, which
provides that:

"Any person who counsels, aids or abets in the com-
mission of any offense may be charged, tried and con-
victed in the same manner as if he were a principal."
(Crim. Code, § 115.)

The following instructions were given, which it is insisted were erroneous:

"2. You are instructed under the law of Kansas any one who aids, abets, or assists another or others in the commission of any crime either by conspiring or confederating together, counselling and advising in the commission of such crimes and preparation thereof, or by counselling, aiding or assisting in the commitment thereof, or by knowingly concealing the crime and its results, is equally guilty with the one actually committing the crime, and you are therefore instructed in this case that should you find beyond a reasonable doubt that the defendant conspired and confederated with other persons for the commission of the crime alleged in the information, and that he did in any way aid, assist or abet in its commission, either by counsel or· concealment, then he is guilty as though he had himself, without assistance, committed the crime.

"3. Your attention to the last instruction stated leads to the understanding that the field of inquiry in this case divides itself in two sections, each of which should receive the careful and conscientious consideration of the jury:

"First: Did the defendant in person at the time and place charged beyond a reasonable doubt, actually and physically break into and rob the Beattie State Bank in manner set forth in the information; and,

"Second: If you should fail to be satisfied from the evidence beyond a reasonable doubt that the defendant actually and in person was at Beattie at the time and place stated, and in person physically by himself or with the assistance of others, broke into and robbed said bank as charged, then the inquiry under the law would be whether or not the defendant, beyond a reasonable doubt, was guilty as charged by reason of the fact that he, though not actually present at the time and place of the commission of the crime, had guilty knowledge of the intent and plan and preparation to commit such crime, and did, though not present, actually help, plan, counsel, aid and abet others, conspiring and confederating of others in the plan and purpose, and in the preparation and carrying out of such common plan and purpose and knowingly concealing the crime, and aiding, assisting and facilitating the escape of the actual participants in the burglary." . . .

It is argued that the parts of these instructions relating to concealment are erroneous. It should be observed, however, that in instruction No. 2 the jury were informed that one who aids, abets or assists in the commission of a crime by counselling and advising in the commission, or by knowingly concealing the crime, is equally guilty. Not that he is guilty of the offense if he conceals it, but if he aids in its commission (among other things) by concealing it, he is guilty. No. 3 was given as an explanation of No. 1, informing the jury that one may be guilty if present in person, doing the deed alone or with others, or he may be guilty if he, having guilty knowledge of the plan, did actually help, plan, counsel, aid and abet others by aiding, assisting and confederating with them in carrying out such plan and purpose *and* knowingly concealing the crime *and* aiding and assisting the escape of the perpetrators. The instruction, it will be seen, not only required the state to prove that the defendant aided, counselled or abetted in the crime, but that he also concealed it, and facilitated the escape of the others. The instructions on this subject were unnecessarily full, and the references to concealment might have been omitted, but their inclusion placed upon the state a greater burden than was necessary, and if properly understood, as we must presume they were, the defendant has no just ground for complaint.

The court was asked to give a general instruction that it is the policy of the law that it is better that a guilty person should escape rather than that an innocent man should be convicted. It is doubtful whether juries are assisted by such general observations, after being fully instructed, as they were in this instance, upon the presumption of innocence and the necessity of proof of guilt beyond a reasonable doubt before a verdict of guilty can be found. The rights of the defendant were fairly safeguarded in the instruction given.

Objection is made to the form of the verdict finding

the defendant guilty of burglary and larceny in the second degree. If the defendant was guilty of burglary at all it was burglary in the second degree. The instructions in effect so stated. If also guilty of stealing any amount, the offense of burglary in the second degree and larceny was established. This must have been the finding of the jury, and their verdict was rightly so interpreted, and sentence pronounced accordingly (under the indeterminate sentence law) at imprisonment from five to ten years, as prescribed for burglary in the second degree. (Gen. Stat. 1909, § 2559.)

It was not necessary to prove the personal presence of the defendant at the time and place of the crime. It is sufficient if he counselled, aided or abetted in its commission. But the fact, if it be a fact, as testified to by several witnesses, that he was at Wymore at ten o'clock on the evening of the 7th of November, and also at six or 6:30 in the morning of the 8th, does not prove that he was not at Beattie between two and three o'clock in the morning when the bank was broken into. The distance is not shown, but it is approximately forty miles. It was in evidence that an automobile could make the run between Wymore and Beattie in an hour and a half or two hours.

While the evidence is wholly circumstantial, its weight was for the jury. We find it sufficient to sustain the verdict. No prejudicial error being shown, the judgment is affirmed.