STATE, RESPONDENT, *v.* VETTERE, APPELLANT.

(No. 5,957.)

(Submitted June 22, 1926. Decided July 2, 1926.)

[248 Pac. 179.]

*Criminal Law—Homicide—Jury—Challenges—Evidence—Dying Declarations—Witnesses—Insanity—Burden of Proof.*

Criminal Law—Jury—When Challenge Properly Denied.
   1. The provision of section 11962, Revised Codes of 1921, that in challenging a juror for implied bias one or more of the causes stated in section 11960, and in challenging for actual bias the cause stated in subdivision 2 of section 11959, must be alleged, is mandatory; hence where this is not done, denial of the challenge does not entitle appellant to allege error.

Same—Jury—When Juror not Disqualified by Expression of Opinion That Crime had Been Committed.
   2. Where a juror on his *voir dire* stated that from newspaper reports and conversations with others he had formed the opinion that murder had been committed, but had no opinion as to the guilt or innocence of the defendant, that he would require the state to prove beyond a reasonable doubt that the latter had killed deceased with malice aforethought before he would vote for a conviction, and that he could fairly and impartially try him, he was not disqualified from serving.

Homicide—Dying Declarations—Admissibility Question for Court.
   3. The question whether a dying declaration is admissible is one for the court's decision after hearing preliminary proof concerning the condition of the declarant and the circumstances surrounding the making of the statement, whereupon, if admitted, the question of its sufficiency and the weight to be given it is for the jury's determination; hence refusal to submit instructions stating the rule governing the admission of such declarations was not error.

Same—Dying Declarations—Admissibility.
   4. Evidence *held* sufficient to show that when decedent whose abdomen had been torn open by a charge of heavy shot at close range, made the statement that defendant had fired the shot, he did so under a sense of impending death, and therefore it was admissible as his dying declaration.

Trial—Recross-examination—Proper Exclusion as Repetitious.
   5. Where a witness on his cross-examination had answered a question, refusal to permit him to answer the same question on recross-examination was proper.

Same — Witnesses — Failure to Understand Oath — Motion to Strike Proper Remedy.
   6. A witness of foreign birth who knew that when he was sworn he was taking an oath and who testified on cross-examination that he had told nothing but the truth, was not disqualified

2. See 16 R. C. L. 264.
4. See 1 R. C. L. 544.

[76 Mont. 574.]

by the fact that he did not understand what was said when the oath was administered to him; if counsel believed he did not understand the nature of an oath he should have moved to strike all of the testimony of the witness.

Homicide—Deliberate Killing—Evidence—Sufficiency.
7. Where defendant after deliberately firing a load of heavy shot into the body of a person at close range killing him instantly, made the remark that he would do likewise to deceased and did so and on his trial pleaded insanity, the circumstances were sufficient to show a wilful, deliberate 'murder and the contention that in the absence of evidence of malice aforethought a judgment of murder in the first degree cannot be sustained, *held* without merit.

Same—Insanity—Burden of Proof on Defendant.
8. Under Chapter 87, Laws of 1925, defendant charged with homicide, has the burden of proving his defense of insanity by a preponderance of the testimony, and an instruction that the state was required to prove beyond a reasonable doubt that he was sane was erroneous.

Same—When Instruction on Manslaughter Improper.
9. Where defendant under the evidence was either guilty of murder or not guilty by reason of insanity, the court properly refused to give an instruction on the subject of manslaughter.

Same—New Trial on Ground That Testimony of Witness is Incredible—Rule Held Inapplicable.
10. Testimony of a witness examined and *held* not so improbable, incredible or impossible as to make applicable the rule that where the surrounding circumstances make the story of a witness highly improbable or incredible, or when his testimony is inherently incredible, a new trial should be ordered.

---

[1] Juries, 35 C. J., sec. 368, p. 338, n. 22; p. 339, n. 26, 29.
[2] Hearsay, 29 C. J., p. 286, n. 36 New; Juries, 35 C. J., sec. 374, p. 342, n. 93; p. 343, n. 95; sec. 377, p. 344, n. 13; sec. 385, p. 349, n. 80; sec. 430, p. 385, n. 6; p. 386, n. 16, 17; Rumor, 34 Cyc., p. 1609, n. 7; p. 1821, n. 79; p. 1822, n. 80, 81.
[3] Homicide, 30 C. J., sec. 497, p. 254, n. 19; sec. 498, p. 255, n. 24; sec. 506, p. 267, n. 68; p. 268, n. 71; sec. 507, p. 268, n. 78; p. 270, n. 84, 88; sec. 510, p. 272, n. 29 New; sec. 521, p. 279, n. 37; sec. 700, p. 440, n. 98 New.
[4] Homicide, 30 C. J., sec. 503, p. 261, n. 9; sec. 504, p. 265, n. 43; sec. 505, p. 266, n. 56; sec. 696, p. 440, n. 80 New.
[5] Witnesses, 40 Cyc., pp. 25, 31, n. 59 New.
[6] Witnesses, 40 Cyc., pp. 25, 31, n. 59 New.
[7, 8] Homicide, 30 C. J., sec. 353, p. 143, n. 90; sec. 550, p. 304, n. 54; sec. 557, p. 310, n. 25.
[9] Homicide, 30 C. J., sec. 659, p. 414, n. 79.
[10] Criminal Law, 16 C. J., sec. 2290, p. 929, n. 86; sec. 2291, p. 930, n. 93; 17 C. J., sec. 3593, p. 255, n. 52; sec. 3596, p. 267, n. 39.

*Appeal from District Court, Silver Bow County; J. J. Lynch, Judge.*

---

8. Proof of defense of insanity, see note in 76 Am. St. Rep. 93. See, also, 14 R. C. L. 625.

TONY VETTERE was convicted of first degree murder, and appeals from the judgment and from an order refusing him a new trial. Affirmed.

*Messrs. Walker & Walker, Mr. C. S. Wagner* and *Mr. M. S. Galasso,* for Appellant, submitted a brief; *Mr. Thomas J. Walker* and *Mr. Wagner* argued the cause orally.

The court erred in disallowing defendant's challenge for cause interposed against juror Kinney. (*State* v. *Russell,* 73 Mont. 240, 235 Pac. 172; *People* v. *Helm,* 152 Cal. 532, 93 Pac. 99–105; *People* v. *Wismer,* 58 Cal. App. 679, 209 Pac. 259–261. See, also, *Coughlin* v. *People,* 144 Ill. 140, 19 L. R. A. 57, 33 N. E. 1; *Scribner* v. *State,* 3 Okl. Cr. 601, 35 L. R. A. (n. s.) 985, 108 Pac. 422; *State* v. *Otto,* 61 Kan. 63, 58 Pac. 995; *Middleton* v. *State,* 16 Okl. Cr. 320, 183 Pac. 626; *State* v. *Brooks,* 57 Mont. 480, 188 Pac. 942.)

The alleged declarations of the deceased, taken piecemeal, or collectively, fall far short of showing that it was made *in articulo mortis.* (*State* v. *Phillips,* 118 Iowa, 660, 92 N. W. 876; *State* v. *Kacar,* 74 Mont. 269, 240 Pac. 365; *State* v. *Doris,* 51 Or. 136, 16 L. R. A., (n. s.), 660, 94 Pac. 44.)

Declarations which it was testified to were made by deceased at the hospital were inadmissible for any purpose, they were not dying declarations and they were not declarations admissible as part of the *res gestae,* but were purely hearsay relating to past occurrences. (*State* v. *DeHart,* 38 Mont. 213, 99 Pac. 438; *State* v. *Pugh,* 16 Mont. 343, 40 Pac. 861; *State* v. *Judd,* 20 Mont. 420, 51 Pac. 1033.)

*Mr. .L. A. Foot,* Attorney General, *Mr. I. W. Choate,* Assistant Attorney General, *Mr. T. E. Downey,* County Attorney of Silver Bow County, and *Mr. N. A. Rotering,* Assistant County Attorney, for the State, submitted a brief; *Mr. Choate* and *Mr. Downey* argued the cause orally.

[76 Mont. 574.]

Defendant's challenge to Juror Kinney was properly disallowed: (*State* v. *Byrne,* 60 Mont. 317, 199 Pac. 262; *State* v. *Russell,* 73 Mont. 240, 235 Pac. 712; *State* v. *Juhrey,* 61 Mont. 413, 202 Pac. 762; *State* v. *Haworth,* 24 Utah, 398, 68 Pac. 155; *State* v. *Hoerr,* 88 Kan. 573, 129 Pac. 153; *State* v. *Olsen,* 88 Kan. 136, 127 Pac. 627; *Cason* v. *State,* 52 Tex. Cr. 220, 106 S. W. 338; *State* v. *Ware,* 58 Wash. 526, 109 Pac. 359; *People* v. *Foglesong,* 116 Mich. 556, 74 N. W. 730; *State* v. *Weems,* 96 Iowa, 426, 65 N. W. 387; *State* v. *McDaniel,* 39 Or. 161, 65 Pac. 520; *State* v. *Hoagland,* 39 Idaho, 405, 228 Pac. 314).

The dying declaration of decedent was properly admitted in evidence. (*State* v. *Crean,* 43 Mont. 47, 57, Ann. Cas. 1912C, 425, 114 Pac. 603; *State* v. *Kacar,* 74 Mont. 269, 240 Pac. 365; *State* v. *Byrd,* 41 Mont. 585, 111 Pac. 407; *Keaton* v. *State,* 41 Tex. Cr. 621, 57 S. W. 1125; *Winfrey* v. *State,* 41 Tex. Cr. 538, 56 S. W. 919; *State* v. *Roberts,* 28 Nev. 350, 82 Pac. 100; *Miller* v. *State,* 27 Tex App. 80, 10 S. W. 445.)

MR. JUSTICE MATTHEWS delivered the opinion of the court.

On February 23, 1926, the defendant, Tony Vettere, was convicted of the crime of murder in the first degree in the district court of Silver Bow county, and on March 13, 1926, he was by the court duly sentenced to be hanged. From the judgment and from an order of the court refusing him a new trial this appeal is prosecuted. Numerous assignments of error are made and will sufficiently appear hereinafter.

The testimony adduced at the trial tends to establish the following facts: On the night of November 22, 1925, Antone Favero and Joe Ciccarelli, while standing in front of the Antone Favero home at 201 North Main Street, Meaderville, each received, at short range, a charge of No. 4 shot in the body, discharged from a 12-gauge shotgun. Ciccarelli

died immediately and Favero died in the Murray Hospital within two hours after he was shot.

Some confusion was caused at the trial by reason of the fact that most of the witnesses spoke through an interpreter and that there were four houses, apparently within a block of one another, on North Main Street, Meaderville, known as the Favero house or home. It is clear, however, that the home of Antone Favero was farthest north and stood on the corner of the street and an alley, facing the street; that something like 125 feet to the rear, facing the alley, stood another house occupied by members of the Favero family; next to the south on Main Street, at No. 131, was the home of Ben Favero and his wife; and still farther south, but just how far not being disclosed, stood another house occupied by the Ben Favero family. Joe Ciccarelli lived across the street from Antone Favero. One Jim Marsetti, with his wife and family, lived a short distance to the north of the Antone Favero home, while the defendant lived in a cabin near the Marsetti home.

In the late afternoon of November 22, 1925, the defendant, an Italian miner, had become drunk and boisterous. He visited the Marsetti home, taking with him a shotgun and a revolver. He created considerable disturbance, caused considerable damage, and attempted to force Mrs. Marsetti to drink some of his wine. He raised some objection to the attentions of a certain young man to Marsetti's daughter. He finally became so obnoxious that Mrs. Marsetti required her husband and another to put him out of the house. He wanted to leave his shotgun with Mrs. Marsetti, but she told him to take it with him. In the street he met Miss Marsetti and her escort, whereupon he called the young man a vile name and shot at him twice with his revolver. The young man left, declaring he would notify the police, and the defendant disappeared.

Mrs. Ben Favero saw and recognized the defendant in front of her home at 131 North Main on her return from

the "picture show" that evening, though she did not notice how he was dressed or whether he carried anything in his hands. He was then going south on the street. She fixed the time at about 9:15 or 9:30.

Another witness saw the defendant in front of a drugstore to the south of all of the Favero houses the same evening. He then had a "long gun" in his hands. This witness thought the time a little before 9 o'clock.

A sixteen-year-old girl, going to the drugstore from her home to the north of the Antone Favero home, passed the defendant, as she thought, about ten or fifteen minutes before nine. He was then standing in the street with one Ligui Battestella. He then had a gun about three feet long in his hands. Battestella testified through an interpreter that he roomed in the Ben Favero house at 131 North Main Street and boarded at the lower Favero house, the number of which he did not know; that about 9:30 he was going from the house where he boarded to the house where he roomed for something to smoke; that he had passed three or four houses and came in front of an empty house which was demolished, when the defendant came from the demolished house and put a long gun in his face. The witness asked why defendant wanted to shoot him, and defendant said, "Who are you?" to which the witness replied, "I am Ligui; don't you know me?" Witness then asked defendant to come with him and get something to drink, and, while the defendant's attention was distracted, seized the gun, whereupon defendant produced his revolver and compelled him to return the gun. The defendant then said: "You go your way, and I will go my way." Asked if the defendant did not then seem excited, the witness answered: "No, he seemed placid." Battestella frequently stated that he could not fix distances, but, on being urged, fixed the place of meeting at 145 "yards" from the Antone Favero house, but he demonstrated that it was north of 131, for on cross-examination he testified that when the defendant told him

to go his way he went toward Meaderville, or south, to go to the house where he roomed, or No. 131. The witness further testified that, while he was so progressing and with his back turned and within a minute and a half of the time he left defendant, he heard a shot. He turned around and immediately saw a flash in the dark and heard a second shot. He ran to the place where the shots were fired, taking but three-fourths of a minute to do so. He there found Ciccarelli dead on the ground and Favero, "lamenting pain," trying to draw himself up by holding to the picket fence. The witness testified that he then saw the defendant at or in an alley a distance of about twenty yards away, walking fast or running away; that he ran after the defendant with the intention of detaining him, but that defendant again put the gun to his face, and he therefore ran away; went directly to the house where he roomed and to bed, where he spent a bad night with visions of the two men he had seen on the ground. This witness did not see members of the Favero family at the scene of the shooting, nor did they see him, although they came from the rear house immediately on hearing the shots. The witness, although confused as to distances, remained steadfast as to the facts he had related and as to the time being about 9:30, though he stated that he had no watch.

The doctor who received Favero at the hospital, to which he was rushed immediately, testified that he was brought in about 9 o'clock. He further testified that Favero was then in a dying condition—no pulse and heart fluttering, "he was in extremis," but that he rallied to strong stimulation and, after that, was conscious and rational; that he then talked in the Italian language with members of his family, though the doctor could not understand what was said. With regard to these conversations, John Favero, deceased's eldest son, 26 years old, testified: "I asked him if it pained very much; he says, 'Yes.' I said, 'Well, cheer up,' I says, 'Maybe by morning you will feel better  *  *  *  the nurse is

going to get you something to make you sleep.' He said, 'I'll never feel this pain in the morning' ''; that his father then told him that he was the ''oldest one at home now, take care of ma and also take my keys and give them to her''; also to take his pocketbook to her. After this conversation the witness asked Favero who shot him, and he replied, ''Tony Vettere,'' and after some questioning as to the gun, he stated, ''It was a shotgun.'' Later deceased's wife called at the hospital with other sons and a Mrs. Perga, and in the presence of these witnesses Favero made further statements of like character.

On cross-examination before the court in the absence of the jury, John Favero was asked if at the coroner's inquest he did not make the following statement: ''He was paining awful, and he said, 'I can't stand this very long; I want to get up and go out'; wanted to do something; and ma told him, 'You will be all right in the morning'; and he said, 'I will be$^{0}$ all right by morning; no more pain'; and by that he meant he knew he was going.''

Mrs. Favero testified: ''I ask my husband who shot him, and he said, 'You know that Tony Vettere, that he have trouble all the time with Joe Ciccarelli, and he shot Joe,' and then he said, 'There is Favero, and for Favero too, and he shot me'; he said, 'He didn't have any business to shoot me; I didn't have nothing to do with him.' '' On motion of counsel for defendant ''all reference to trouble with Ciccarelli'' was stricken from the answer.

At 10:30 on the night of the homicide Vettere appeared at the home of one John Wilplinger, where he removed an empty shell from his shotgun and reloaded the gun. He sought to exchange hats with Wilplinger. He was then sober according to the witness. The empty shell was produced at the trial and was of the same make and gauge as shells loaded with No. 4 shot found in defendant's cabin. No. 4 shot were found in deceased's body. Later that night defendant appeared at a section-house where he succeeded

in changing hats. He had his shotgun with him, and stated that he had been on the mountain hunting. He was captured the next morning six miles from the scene of the homicide.

The defense was intoxication to such an extent as to deprive defendant of knowledge of his actions, and insanity. In his own behalf defendant testified that he had at one time gone to Basin to work because he drank too much in and about Butte; that for a long time he had not slept well; that he had dreams and visions which disturbed his rest. He testified further to getting drunk on the afternoon of the 22d of November and to shooting at the young man at the Marsetti home, giving as his reason that someone struck him in the face; that he had no recollection of what happened after that.

Several witnesses were called to testify that at times the defendant was "wild," "insanse," and "crazy," and it was in this connection that the trouble at the Marsetti home was first related. Other witnesses testified to defendant entering a certain store long prior to the date of the homicide and there exhibiting a revolver. When cautioned concerning his actions, he stated that the revolver was safe and, to show that it was, he pulled the trigger, when a bullet was imbedded in the icebox. He became angry at the witness who remonstrated with him and ordered him out of the store, with threats of death.

As impeachment of Battestella, two witnesses testified that they had seen him at a dance after 10 o'clock on the night of the homicide.

1. Assignments numbered 1, 2 and 3 predicate error upon [1] the court's disallowance of defendant's challenge to juror Harry A. Kenny, Jr. This juror qualified fully on his *voir dire* examination by the county attorney. On examination by counsel for the defendant, the juror stated: "I read about this case and discussed it, but didn't arrive at a conclusion at the time; did arrive at the conclusion that a crime had been committed, but did not arrive at the conclusion that the de-

fendant had committed the crime. * * * The state would not have to prove to me by any evidence that a crime had been committed; I know that already." Whereupon counsel stated: "We challenge for cause." The court thereupon examined the juror at some length and from his answers it appeared that the juror had read accounts of the killing in the public press and "talked with some men who passed along there shortly after the body was picked up"; that these men saw Favero after he was shot and before he was taken to the hospital and told the juror that Favero had been shot with a shotgun, which seems to be the extent of the information he received from them. He stated that he had formed the opinion that the deceased came to his death by "criminal means" and that he did not believe he could lay that opinion aside, but that he had no opinion as to the guilt or innocence of the defendant and would require the State to prove beyond a reasonable doubt that defendant killed Favero with malice aforethought, before he would vote for a conviction, to which must be added proof of premeditation and deliberation before he would vote for a verdict of murder in the first degree; that he could give both parties a fair and impartial trial and would give fair and impartial consideration to the defense of insanity if interposed. The court then said: "The authorities are against you, Mr. Galasso, on the point you have raised. There are many authorities directly in point. The juror has answered all the questions asked bearing on the point to the effect that he had no opinion at all as to the defendant's connection with the killing. The challenge is disallowed." To this ruling the defendant duly excepted. Counsel for defendant then further examined the juror by stating to him the instructions which would probably be given the jury on murder in the first degree and second degree and on manslaughter, and on the defense of intoxication and insanity and on other matters, and asked the juror whether he would be governed by those instructions if given; to all of which questions the juror answered in the affirmative. Counsel then stated: "We pass the juror without waiving any rights under our challenge."

Thereafter the defense exhausted all of its peremptory challenges and went to trial with Kenney in the jury-box.

The Attorney General contends: That the challenge "was not based upon any cause and its denial does not give appellant any right to allege error."

Section 11959, Revised Codes of 1921, declares that "particular causes of challenge are of two kinds—: "1. For such a bias, as, when the existence of the facts is ascertained, in judgment of law disqualifies the juror, and which is known   *   *   *   as implied bias. 2. For the existence of a state of mind on the part of the juror in reference to the case, or to either of the parties, which will prevent him from acting with entire impartiality and without prejudice to the substantial rights of either party, which is known   *   *   *   as actual bias." Section 11960 then states nine grounds of challenge for implied bias, and section 11962 declares that "in challenging for implied bias one or more of the causes stated in section 11960 *must* be alleged. In challenging for actual bias, the cause stated in the second subdivision of section 11959 *must* be alleged," *etc.*

The use of the word "must" above renders the requirement mandatory. (*State* v. *Mason*, 62 Mont. 180, 204 Pac. 358; *State* v. *Dotson*, 26 Mont. 305, 67 Pac. 938; *State* v. *McClellan*, 23 Mont. 532, 75 Am. St. Rep. 558, 59 Pac. 924.) Failure to obey the mandate of the statute renders the challenge nugatory, and on this ground alone we would be justified in sustaining the ruling of the trial court; but, owing to the gravity of the defendant's situation, we will not dispose of these assignments on this technical ground. The same condition of the record was found in *State* v. *Byrne*, 60 Mont. 317, 199 Pac. 262, also a murder case, and there the court merely called attention to the fact that the challenges were wholly general and proceeded to dispose of them on the merits, and like consideration was accorded the defendant in *State* v. *Russell*, 73 Mont. 240, 235 Pac. 712.

Counsel for the defendant assert that error was committed [2] in permitting the juror to try the case after he had stated

that the State did not have to prove the *corpus delicti,* which the statute required to be established by direct proof. (Sec. 10962, Rev. Codes 1921.) This contention has heretofore been disposed of by this court. In the case of *State* v. *Byrne, supra,* it is said that, although certain jurors testified that they had formed an opinion that the deceased had been murdered and at least one stated that he had that opinion at the time of the examination, "not one of the jurors stated that he had any belief that the defendant committed the crime, and the court did not err in denying the challenges," citing cases from this and other jurisdictions. This rule is followed generally in other jurisdictions having statutes similar to ours.

In *State* v. *Haworth,* 24 Utah, 398, 68 Pac. 155, 158, it is said: "The defendant assigns as error the denial of the challenge to these four jurors * * * on the ground that the fact was disclosed in their examination that they had formed opinions that the deceased had been unlawfully killed by someone; that a crime had been committed; and that it would require evidence to remove the opinion so formed. While it is true they had formed such opinions, it appears that they had formed no opinion as to who had killed the deceased; and each one stated that he had no prejudice against the defendant, and could act impartially in the case. It is well settled that the denial of a challenge for bias [prejudice], under facts such as are disclosed by the examination of said jurors, is not error"—citing a long list of authorities. (See, also, *State* v. *Olsen,* 88 Kan. 136, 127 Pac. 627; *State* v. *Ware,* 58 Wash. 526, 109 Pac. 359; *Cason* v. *State,* 52 Tex. Cr. 220, 106 S. W. 338; *State* v. *Morse,* 35 Or. 462, 57 Pac. 631.)

In *State* v. *Hoerr,* 88 Kan. 573, 129 Pac. 153, it appears that, as in the case at bar, there was no dispute as to the fact that a crime had been committed. The court upheld the ruling of the trial court on the ground that the opinion of a juror that a crime had been committed, was not an opinion upon a material disputed fact and that, therefore, the juror was qualified.

The recent case of *State* v. *Hoagland*, 39 Idaho, 405, 228 Pac. 314, is very similar to the instant case. There the defense to a charge of homicide was insanity. The facts on which jurors had an opinion were said to be clearly established by the evidence and not disputed, and, while the jurors had formed an opinion to the effect that the crime charged was committed, they had neither formed nor expressed an opinion as to the sanity or insanity of the accused, and on such findings were held to be qualified jurors.

Here there was no dispute on the trial as to whether Favero was killed by criminal means by someone, and the juror Kenney had no opinion on any matter on which the minds of the jurors might differ. His examination brought him well within the rule laid down by this court in *State* v. *Juhrey*, 61 Mont. 413, 202 Pac. 762, that "the fact that a person called as a juror has formed an opinion or impression shall not disqualify him to serve as a juror in such case if he shall, upon oath, state that he believes he can fairly and impartially render a verdict therein in accordance with the law and evidence, and the court shall be satisfied of the truth of such statements." It is true that in that case the opinion referred to was formed from reading newspaper accounts, but section 11962, above, includes not only opinions founded upon "statements in the public journals," but also those founded upon "public rumor" or "common notoriety."

The persons whom the juror talked with, in addition to reading the accounts in the papers, were not witnesses to the commission of the crime, nor witnesses at the trial; what they told the juror was clearly hearsay. "Rumor is defined by Webster to be 'flying or popular report; a current story passing from one person to another without any known authority for the truth of it'; 'report' is a synonym for 'rumor,' another is 'hearsay' and another 'story.' " (*State* v. *Culler*, 82 Mo. 623.) It is therefore immaterial whether the juror's opinion was based upon what he read in the newspapers or upon the hearsay statements of others; the rule applies. No error was committed in disallowing the challenge.

2. Specifications 4 to 6, inclusive, predicate error upon the [3] court's action in giving its instruction No. 27, and in refusing to give certain offered instructions purporting to define a dying declaration and state the rule governing the admission of such declaration. The objection raised to this action on the part of the court is that the court thereby withdrew from the consideration of the jury "the vital question as to whether or not the statements were made *in articulo mortis.*"

Under section 10531, Revised Codes of 1921: "Evidence may be given upon a trial * * * of * * * the act or declaration of a dying person, made under a sense of impending death, respecting the cause of his death." The "evidence" which may be admitted is the act or declaration respecting the cause of, or manner in which the declarant received, the injury from which he was then dying. This evidence becomes admissible on a showing that the declarant was then dying and that he made the declaration "under a sense of impending death," which proof goes only to the admissibility of the testimony and does not tend to prove or disprove any issue to be submitted to the jury.

Section 10698, Revised Codes of 1921, provides that "all questions of fact * * * other than those mentioned in the next section, are to be decided by the jury, and all evidence thereon is to be addressed to them, except when otherwise provided by this Code." The "next section" (10699) declares that "all questions of law, including the admissibility of testimony, the facts preliminary to such admission * * * are to be decided by the court," etc. Our Codes, therefore, expressly withdraw from the consideration of the jury the question of the admissibility of the testimony, and the court but performed the duty imposed upon it by statute in determining the admissibility of the dying declaration upon the preliminary showing of facts tending to prove its admissibility and in refusing to submit that question to the jury, and the objections raised on the settlement of the instructions on this ground were without merit. (See *State* v. *Sherman,* 35 Mont. 512,

119 Am. St. Rep. 869, 90 Pac. 981; *State* v. *Berberick*, 38 Mont. 423, 16 Ann. Cas. 1077, 100 Pac. 209). The question of the sufficiency of the evidence and its weight is for the jury. (*State* v. *Kacar*, 74 Mont. 269, 240 Pac. 365.)

In order to determine the competency of the evidence offered for submission to the jury, the court followed the proper practice as outlined in *State* v. *Kacar*, above, by excusing the jury while the witnesses were being interrogated concerning the condition of the declarant and the circumstances surrounding the making of his statement, with his statements tending to show that he knew that he was then in a dying condition, and, having determined that the declarant's statement "respecting the cause of his death" was competent, recalled the jury and permitted the testimony to be given in its presence. Some complaint is made that the testimony before the jury did not contain the statement made by the declarant that he wanted "to get up and go out," but if the defense wanted that remark before the jury—assuming for the purposes of this discussion that it was admissible—counsel could, and should have brought it out on cross-examination.

3. It is next asserted, under specifications numbered 7 to [4] 10 inclusive, that the court erred in admitting the dying declaration.

The extent to which the general rule governing the admission of dying declarations has been extended in other jurisdictions is ably discussed by Mr. Justice Holloway in *State* v. *Martin*, 76 Mont. 565, 248 Pac. 176, and that discussion need not be here repeated. In this state we are governed by the express provisions of section 10531, above.

However, in the case at bar, it is beyond question that Favero was dying at the time he made his declaration and it is conceded that it was incumbent upon the State, in order to have the declaration admitted, to show that Favero knew that he was dying at the time he made it. Counsel for defendant contends that the statement, "I want to get up and go out," taken in connection with the statement that the

declarant would feel no pain in the morning demonstrates the fact that Favero did not know his condition and thought that he would be all right in the morning. If those statements constituted all the evidence to be considered, they would at least raise a reasonable doubt as to the sense of impending death; but declarant further stated that he was in great pain at the time. His abdomen had been torn open by a charge of heavy shot at close range so that his bowels protruded. When told that he would "maybe" feel better in the morning, he replied, "I'll never feel this pain in the morning," and thereupon said to his son, John, "You are the oldest one at home now, take care of ma." It is hardly possible that, in his then condition, after 10 o'clock at night, the declarant could have believed that he would be all right in the morning, or would never feel pain thereafter from such a ghastly wound, if he was to live, or that, had he so believed, he would have felt it necessary to admonish his son to take care of his wife.

Even on the cold record we are irresistibly drawn to the conclusion that Favero was, beyond a reasonable doubt, fully aware of his dying condition. The evidence in support of the court's decision to that effect is substantial, and with that decision we cannot interfere. The statement was therefore unquestionably admissible, and no error was committed in its admission. (*State* v. *Russell,* 13 Mont. 164, 32 Pac. 854; *State* v. *Byrd,* 41 Mont. 585, 111 Pac. 407; *State* v. *Crean,* 43 Mont. 47, Ann Cas. 1912C, 425, 114 Pac. 603; *State* v. *Kacar,* above; *State* v. *Martin,* above.)

4. The eleventh specification is that the court erred in sustaining an objection to the question propounded to Battestella: "Is it true that after the first time Mr. Vettere put the gun to you you went in the opposite direction?" The record discloses that this witness had been cross-examined at length and particularly upon his statements that, when Vettere said to him, "You go your way, and I will go my way," he went toward the house in which he roomed, which would be in the opposite direction from that taken by Vettere, and his further statement that he walked with Vettere a distance of six-

teen to eighteen feet. In closing the cross-examination counsel asked the witness: "Now these matters which you relate are just imaginary matters which passed through your mind, are they not?" To which the witness replied: "It is truth." The only question asked on redirect was, "what do you mean by that?" to which the witness replied, through the interpreter, "He mean to say nothing else but the truth." It was then that the excluded question was propounded to the witness.

The record discloses that cross-examination was not restricted. Practically the same question was asked and answered in the affirmative. The question, therefore, was not proper recross-examination; it was repetitious; and the defendant was in no manner prejudiced by the ruling of the court; no prejudicial error was committed in sustaining the objection. (*State* v. *Byrd,* above; *State* v. *Rhys,* 40 Mont. 131, 105 Pac. 494; *State* v. *Brown,* 38 Mont. 309, 99 Pac. 954.)

But counsel contend that, as it appears from the record [6] that during the cross-examination the witness disclosed that he did not understand what was said when the oath was administered to him in the English language, he should have been compelled to answer the question. There is no merit in this contention. The witness stated that he did what the other witnesses did when the oath was administered. It seems clear that, while he did not understand the words, he understood that he was taking an oath. He stated that he told nothing else but the truth. Had counsel believed that he did not understand the nature of the oath, he was at liberty to move to strike all of the testimony of the witness; as he did not do so, he was apparently satisfied to have the testimony of the witness go to the jury. (See *State* v. *Lu Sing,* 34 Mont. 31, 9 Ann. Cas. 344, 85 Pac. 521.)

5. Specifications 12 to 15, inclusive, are argued under the head "Degree of Crime," and under this head counsel contend that the evidence does not show malice aforethought, and therefore cannot support the verdict and judgment of murder in the first degree.

The proof shows that the defendant deliberately discharged [7, 8] a load of heavy shot from a shotgun, at close range, and after he had killed Ciccarelli and declared, "and for Favero, too," he could not have but appreciated that he was about to end the life of Favero and must have deliberately and maliciously intended to do so, if he had the mentality to know what he was doing. He defended on the ground of insanity. By its instruction the court advised the jury that the state must prove beyond a reasonable doubt that the defendant was sane. This instruction threw upon the state a burden not justified by law, for Chapter 87, Laws of 1925, provides that "when the commission of the act charged as a crime is proven, and the defense sought to be established is the insanity of the defendant, the same must be proven by the defendant by a preponderance of the testimony." Notwithstanding the fact that the jurors were required by the instruction to find that the state had proven the sanity of the defendant beyond a reasonable doubt, the jury returned a verdict of guilty; thus finding the defendant to have been sane at the time the killing was done. We must therefore consider the act that of a sane person, and, in a sane person, such an act was murder. What is said by this court in *State* v. *Leakey*, 44 Mont. 354, 120 Pac. 234, is exactly in point here: "Counsel assumes that there should be evidence tending expressly to show the deliberate purpose; but this is not necessary. * * * It is generally to be inferred from facts and circumstances attending the killing. Here the killing is shown to have been done under circumstances which, aside from the alleged mental condition of the defendant, leave no room for an inference other than that it was a wilful, deliberate murder."

6. The next contention of counsel is that the court erred in [9] refusing to instruct on the subject of manslaughter. As shown in the last paragraph, either the defendant was guilty of murder, or he was not guilty by reason of insanity, or the State failed to prove beyond a reasonable doubt that defendant committed the murder; but the crime committed was unquestionably murder. There was no evidence which would justify

a verdict of manslaughter. Under this condition of the record it would have been improper for the court to have instructed on manslaughter. Its only effect would have been "to give the jury an opportunity to return a compromise verdict, probably meaningless from any logical standpoint. * * * Such a verdict neither does justice to the defendant nor the state." (*State* v. *McGowan*, 36 Mont. 422, 436, 93 Pac. 552.) See, also, *State* v. *Calder*, 23 Mont. 504, 59 Pac. 903; *State* v. *Penna*, 35 Mont. 535, 90 Pac. 787; *State* v. *McDonald*, 51 Mont. 1, 149 Pac. 279.)

7. In support of allegations of error committed by the court in refusing to direct a verdict of acquittal and in denying defendant's motion for a new trial, counsel assert that the evidence adduced is insufficient to justify the verdict and judgment. In this connection counsel contend that the conviction rests upon the dying declaration of Favero and the testimony of Battestella; that the dying declaration must be eliminated; and that Battestella's testimony is impeached in part and is otherwise so inherently unreliable and improbable that "it should be denied all claim of respect or consideration in a court of justice."

As to the dying declaration we have already held that it was admissible, and therefore was properly considered by the jury. With this evidence before them, the jury might reasonably have found the defendant guilty on it and the circumstantial evidence of defendant's guilt in the record, without the testimony of Battestella, as the conviction would not rest upon circumstantial evidence alone, but contains the direct evidence that defendant fired the fatal shot.

Counsel contend that the testimony of Battestella is shown [10] to be fabricated and untrue by the following facts and circumstances brought out on the trial: (a) He did not understand the language in which the oath was administered to him; (b) two witnesses contradicted his statement that, after leaving Vettere in the alley shortly after the killing, he went to his room and bed; (c) that his testimony showing that he

[76 Mont. 574.]

reached Favero before members of the Favero family did, cannot be true, as he would have to travel 145 yards or more while they traveled a third of that distance; and (d) that he fixed the time as 9:30, while other witnesses fixed it at anywhere from fifteen minutes to 9 up to 9:30. All of these matters go only to the credibility of the witness and the weight to be given to his testimony was exclusively for the jury. The jurors were at liberty to believe or to disbelieve the testimony of Battestella. They either believed it or, disregarding it, found the defendant guilty upon the remaining evidence, which in itself is sufficient to support the verdict rendered. An appellate court cannot substitute its judgment as to the credibility of a witness or the weight to be given to his testimony for that of the jury, although it is held that ''whenever the surrounding circumstances make the story of a witness highly improbable or incredible, or whenever the testimony is inherently impossible, a new trial should be ordered.'' (*Casey* v. *Northern Pac. Ry. Co.*, 60 Mont. 56, 198 Pac. 141; *First State Bank* v. *Larsen*, 65 Mont. 404, 211 Pac. 214; *Whitney* v. *Bertoglio Merc. Co.*, 65 Mont. 358, 211 Pac. 323.)

We have carefully examined the testimony of Battestella, and are of the opinion, from the cold record alone, that, while it does contain certain contradictions and discrepancies, such as are apt to creep into the testimony of a witness relating to his past experiences under stress of excitement, there is nothing in his testimony nor in the surrounding circumstances which brand it as either improbable, incredible, or impossible It is corroborated in important particulars by other witnesses, as for example: The defendant was seen talking with Battestella at or near the place fixed in his testimony, at or near the time fixed by him, and the defendant then had a gun in his hands. This corroborating witness fixed the time as just before 9, while Battestella fixed it at 9:30. Neither witness consulted a watch. Either may have been right, with the scales leaning toward the correctness of Battestella's estimate, as Mrs. Ben Favero saw the defendant on his road to this

meeting place after she returned home from the picture show and at a time which she fixed as 9:15 or 9:30. Other witnesses fixed the time of the killing prior to 9:30, but none of them fixed the time definitely by reason of having consulted a watch or clock.

Again, as to the distance from the place of the killing: The evidence shows that Battestella was, at the time the shots were fired, going toward the house where he roomed, which was No. 131 North Main Street, with his back toward the place where the first shot was fired, or 201 North Main Street. He was therefore north of No. 131; how far does not appear; but, as 131 and 201 were within the same block, it seems impossible that Battestella was 145 yards away from the scene of the tragedy, and seems highly probable that he was nearer thereto than were the members of the Favero family in the rear house, which was approximately 125 feet from Main Street. It must also be remembered that the witness had cause to believe that a crime was being committed, while those within the house were called forth only because they heard shots. Further, he testified that the first shot was fired within a minute and a half after he left Vettere, and he reached the scene in three quarters of a minute. This would indicate that he was very near the scene of the killing both when he left Vettere and when the shots were fired. It is more than probable that the witness, speaking in a foreign language, did not comprehend the significance of the word "yards" and had in mind "feet" or "meters."

As to the impeaching testimony, if the witness was impeached by the statement that he was at a dance after the hour of 10 o'clock on the night of the killing, it was on an immaterial matter, having nothing to do with any issue in the case. The witnesses, testifying months after, may have been mistaken as to the night on which they saw Battestella at the dance, and the jurors were under no obligation to accept their testimony and reject that of Battestella. We find nothing in the record on which we can say that the evidence does not amply support the judgment.

[76 Mont. 574.]

The remaining specifications of error, seven in number, relate to the court's action in sustaining objections to questions propounded to witnesses; five of them on cross-examination of witnesses for the state, and two to Marsetti on direct examination.

We have carefully examined the record with reference to the specifications and find that there is no merit in any one of them. In closing we will say that the appeal was ably presented by counsel for the defendant. They took advantage of every possible exception in the record and did all that could humanly be done to save their client. On the other hand, the case was, on the whole, carefully tried by the court and the substantial rights of the defendant were fully protected by court and counsel. The greatest latitude was permitted and exercised in cross-examination and, in nearly every instance where an objection was sustained to a question asked the answer was later gotten before the jury in some manner.

The defendant was fairly tried and justly convicted, and, as no prejudicial error appears in the record, the judgment and order of the district court of Silver Bow county are affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES HOLLOWAY and STARK concur

Rehearing denied July 16, 1926.